*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ARRON N. YOUNG, | ) | |
| | ) | Supreme Court No. S-15665 |
| Petitioner, | ) | Court of Appeals Nos. A-11006/11015 |
| | ) | |
| v. | ) | Superior Court Nos. 4FA-08-03022/ |
| | ) | 02834 CR |
| STATE OF ALASKA, | ) | |
| | ) | O P I N I O N |
| Respondent. | ) | |
| | ) | No. 7110 - June 17, 2016 |

Petition for Hearing from the Court of Appeals of the State of Alaska, on Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Petitioner. Eric A. Ringsmuth, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Respondent.

Before: Fabe, Chief Justice, Stowers, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

MAASSEN, Justice.

## I. INTRODUCTION

A defendant accused of involvement in a shooting was convicted at trial, in part on the strength of three eyewitness identifications. He challenged the admissibility of two of the identifications on due process grounds, but the superior court

ruled them admissible. The defendant also requested an eyewitness-specific jury instruction, which the superior court refused. Finally, the defendant argued that he was entitled to a mistrial because of an alleged discovery violation by the State that he learned of mid-trial. The superior court denied his motion, finding that the State had not violated the disclosure rules and alternatively that the defendant had not suffered any prejudice. The defendant was convicted, and the court of appeals affirmed his conviction.

On petition to this court, the defendant argues not only that we should reverse his conviction based on the current law on the admissibility of eyewitness identifications but also that Alaska's due process clause requires the adoption of a new test. He also argues that the superior court erred in failing to give his requested jury instruction and in failing to grant him a mistrial.

We hold that the superior court erred under the law as it currently exists when it held one of the eyewitness identifications sufficiently reliable to be admitted at trial, but that it did not err in admitting the other. We also hold that the superior court erred in refusing to give an eyewitness-specific jury instruction but did not err in denying a mistrial. Because the errors are harmless, we affirm the defendant's conviction.

We also conclude, however, that the current test for the admissibility of eyewitness identification evidence does not adequately protect the right to due process under the Alaska Constitution. We therefore identify factors that courts should consider in future cases when deciding whether to admit eyewitness identification evidence.

## II.     FACTS AND PROCEEDINGS

### A.     The Crime And The Investigation

During the summer of 2008 a series of violent incidents took place in the Fairbanks area between members of two gangs, the Bloods and the Crips. In late July there was a fight inside the Fairbanks Walmart; in early August there was another at the Tanana Valley Fair. Persons known or alleged to be current or former members of the Bloods were later shot at outside the Eagles Hall by persons shouting Crips slogans.

The incident at issue here occurred on August 15 at approximately 4:00 p.m. A green Buick sedan carrying alleged members of the Bloods was traveling down College Road in Fairbanks, followed by friends in another car. Another vehicle variously described as a gray, silver, or white SUV passed them going the other way, made a U-turn, and pulled up alongside the Buick. Someone in the SUV started shooting at the Buick and continued to do so while the vehicles raced along for what was later estimated to be two miles.

No one was injured in the shooting, but the Buick was significantly damaged. Bullets also passed through two uninvolved vehicles, narrowly missing their passengers. A bystander walking her bike reported hearing a bullet pass by her head; she jumped into a ditch to take cover.

Later that evening the police arrested Arron Young. He had a gun in the waistband of his pants and the key to a silver SUV in his pocket.

The police interviewed witnesses from the scene and put out a request for those with information to come forward. Jason Gazewood, a criminal defense attorney and former prosecutor, contacted the police department to report that he had witnessed part of the gunplay. A police detective visited Gazewood's office and showed him a six-

person photographic array; Gazewood picked Young as looking most like the man he had seen behind the wheel of the SUV.

A grand jury convened in September 2008. There Gazewood testified about what he had seen. Another witness, Arles Arauz, also identified Young as the driver of the SUV. Although Arauz had told the police immediately after the incident that he was unable to identify the assailants, at the grand jury hearing he picked Young's picture out of a photographic array. But a third grand jury witness, John Anzalone, failed to identify Young and picked another man instead.

The grand jury indicted Young for attempted murder in the first degree and misconduct involving weapons in the first degree.

**B.      Young's Motion To Suppress Gazewood's Identification**

Trial was eventually set for January 4, 2010. In late December 2009 Young moved to suppress Gazewood's pretrial and in-court identifications, claiming that the pretrial identification procedure had been unnecessarily suggestive.

The superior court held an evidentiary hearing. Gazewood testified that the police detective had come to his office about three days after the incident and showed him a six-person photographic array. He testified that he remembered "saying something about . . . having a recollection of it being someone of Samoan descent . . . before the lineup was brought out," though he could not recall whether he said this on the telephone or after the detective arrived at his office. The detective testified that he did not remember whether Gazewood had identified the driver's race in the phone call.

The photographic array contained photographs of six black men but no Samoans. The detective testified that, because Gazewood was an attorney experienced in criminal law, he did not give Gazewood any instructions before showing him the array; he assumed Gazewood would understand the process and its purpose. Gazewood

testified that although he was given no instructions, he assumed that the array contained the suspect because he had been involved in many such procedures in the past. He also testified, however, that he did not feel he was required to select someone from among the photos he was shown.

Gazewood testified that he quickly narrowed his choice to two photos, one of which was Young's. Though conflicted, he was most focused on Young; he testified that the way Young's hair was pulled back in the photograph made him "more like the person I'd seen in the vehicle certainly." He testified that he put his finger tentatively on Young's photograph, at which point the detective told him to "trust your instincts." Gazewood testified that the detective's remark terminated his deliberations, and he selected Young as the man who looked most like the one he had seen in the SUV. When asked at the hearing whether he believed the detective was suggesting the desired result, he answered:

> Yeah, I . . . think he saw me laboring over it and spending a little more time pointing to Mr. Young than the other two, or the other one by the time I had eliminated one of them. And I took it as, you know, you're pointing to this guy more than the others, you know, that's the guy you should identify. . . . I took it as that's the guy we want you to pick.

Gazewood testified that he was leaning toward Young anyway but that the detective's remark "ended this elimination process that I was kind of . . . undergoing. . . . [I]t was a process that was taking a little bit of time and . . . that certainly ended it." The detective testified that he did not remember telling Gazewood to "trust your instincts" but that he knew Young was the suspect and knew Young's photograph was included in the array.

At the evidentiary hearing Gazewood also testified about what he saw of the crime. He testified that while he was waiting at a stoplight on College Road, "the thing that drew [his] attention" was that a "green car" coming from behind him drove "into the oncoming lanes of traffic" to get around the cars waiting at the light. He testified that he then saw a white SUV coming up quickly behind him, and that he observed the driver of the SUV in his rearview mirror for "between three and eight seconds" before the vehicle passed him on the left in pursuit of the green car. He also testified that he had seen Young's photo in the newspaper a week before the evidentiary hearing, and the newspaper photo looked more like the person he recalled seeing at the time of the shooting than did the photo he picked in the array.

The superior court denied Young's motion to suppress. Employing the test we have adopted from *Manson v. Brathwaite*, a decision of the United States Supreme Court,[1] the superior court first found that the photographic array itself was not unnecessarily suggestive because there was "nothing in the photo array to distinguish the defendant's photo from the others." The court found that the detective made the "trust your instincts" comment but that it was not suggestive and did not influence Gazewood's choice. Finally, the court determined that even if the procedure was unnecessarily suggestive, Gazewood's identification of Young was still reliable under the totality of the circumstances and therefore admissible.

---

[1] *Holden v. State*, 602 P.2d 452, 456 (Alaska 1979) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). As we explain below, the *Brathwaite* test first determines whether the identification procedure was unnecessarily suggestive; if it was, then the court must evaluate several factors to assess whether the identification was nonetheless reliable.

### C. Trial

#### 1. Pretrial disclosure of Anzalone's identification of Young

On the first day of trial Young informed the court that the State had just disclosed a police report stating that John Anzalone, who had failed to select Young from the photographic array when testifying before the grand jury, would now identify Young as one of the shooters. Anzalone had informed the prosecutor that he had seen Young's picture on television in connection with the case about a week before trial and was prepared to identify him in court.

Young objected to Anzalone's testimony. He claimed that the pretrial publicity had tainted Anzalone's identification and it was therefore unreliable. He argued that any in-court identification by Anzalone would be improperly suggestive because Young would be the only African-American man sitting at the defense table and this suggestiveness could not be overcome because Anzalone's identification of Young otherwise lacked sufficient indicia of reliability. The superior court ruled that while Anzalone could not testify that he had first recognized Young on television (unless the defense raised the issue on cross-examination), he could identify Young in the courtroom. The court determined that Anzalone's failure to pick Young from the initial photo array did not affect his ability to identify Young at trial, and that any problems with the in-court identification were properly addressed through cross-examination.

#### 2. The State's case at trial

The State presented testimony from occupants of the Buick sedan and the following vehicle, only one of whom, Arauz, could identify a shooter. Some witnesses were unable to say how many people were in the assailants' SUV, while others testified

it had two to four occupants. One witness testified that the assailants had bandanas over their faces.[2]

The driver of the Buick, Joseph Fainuu, testified that although he did not see who was shooting at them, the shots were coming from a gray SUV. He testified that the SUV was the one identified by the State. He further testified that he knew Young by the nickname "Big Nasty" and that he had seen Big Nasty driving the SUV at times before the shooting. Another of the Buick's occupants testified that he had heard others refer to the gray SUV as "Big Nasty's car" at the time of the Eagles Hall shooting, and that, though he could not identify Young as a participant in the College Road shooting, the SUV the State alleged to belong to the shooters appeared to him to be Big Nasty's car. And another witness who had been riding in the second vehicle testified that he heard someone in his car identify the silver SUV as "Big Nasty's truck" right before the shooting started.

The State's ballistics evidence indicated that shell casings retrieved from the scene of the shooting were probably ejected from the gun found in Young's waistband at the time of his arrest. The State also established that the key found in Young's pocket fit the silver SUV identified as the one used in the shootings.

The State presented three eyewitnesses to place Young at the scene. Consistent with his testimony at the evidentiary hearing, Gazewood testified that Young looked like the man he saw drive past him in the SUV. His testimony, however, reflected some uncertainty. He did not say Young was definitely the driver, only that

---

[2] The State also presented testimony about the property damage and near-misses from bullets fired from the SUV, testimony detailing the investigation and other gang-related incidents in Fairbanks, and testimony of a gang expert linking Young to gang membership.

upon seeing Young's photo in the array he "thought that . . . that looked a lot like the person there and then seeing [Young's] photograph in the paper made me think that that looked a lot like the person I'd seen."

The second eyewitness, Anzalone, testified that he was starting a left turn at a traffic light on College Road when he heard "several popping noises" coming from his left. He testified that he saw two vehicles coming directly toward him and "what looked like somebody firing a pistol out of [the] driver's side window" of one of them, an SUV. He testified that he reversed back through the intersection to avoid the oncoming vehicles and, while doing so, observed Young at the wheel of the SUV, though he did not make note of any passengers. Anzalone identified the driver definitively in court as the man "sitting at the defense table," but he also acknowledged his earlier failure at the grand jury to pick Young out of a photo array.

The third eyewitness, Arles Arauz, was an admitted former member of the Bloods. Arauz had known Young since high school, when Young "beat [him] up" in a fight over a romantic interest. Arauz testified that at the time of the shooting he was riding in the vehicle following the Buick sedan. He testified that the Buick started a U-turn, at which point a gray SUV "pull[ed] up and — from the back behind and then start[ed] shooting at it." He testified that he saw Young driving the gray SUV as it passed him in pursuit of the Buick.

Young sought to impeach Arauz on grounds that, although he had identified Young at the grand jury, he had told investigating detectives right after the crime that he could not identify any of the shooters. But Arauz insisted he *had* identified Young to the police on the night of the shooting; this caused some confusion at trial. In the absence of the jury, Arauz testified that the night of the shooting, after he had denied knowing any of the shooters, he met with one of the investigating detectives in an off-the-record

interview and identified Young. The superior court recessed for the day to allow the prosecution to investigate the matter.

### 3. Young's motion for mistrial based on Arauz's newly revealed statements to an investigator

The next morning the State filed with the court a supplemental report of an investigating detective, Detective Elzey, which described how he had indeed met with Arauz a second time on the night of the shooting, after Arauz's initial failure to identify any of the shooters. The report explained that an unidentified man had called the police station that night, stating that a friend knew about the shooting but would talk to investigators only if what he told them was not written down or recorded. Elzey agreed to these terms, and Arauz appeared at the police station and identified Young as the shooter. Called to the stand for voir dire, Elzey testified that he did not disclose this conversation to the prosecutor because he had promised not to. Instead, he decided to wait to see how Arauz testified at the grand jury; if Arauz again identified Young, the detective would consider the matter resolved, and if he did not identify Young the detective would inform the prosecutor of the inconsistency. When Arauz positively identified Young at the grand jury, Elzey decided that no disclosure was necessary.

Young moved for a mistrial. He argued that the State's failure to disclose Arauz's same-day identification of Young violated Rule 16 of the Alaska Rules of Criminal Procedure and prejudiced his defense, which rested in part on showing that Arauz decided to falsely identify Young at the grand jury only after learning that Young was already a suspect. Young argued that Arauz's earlier identification, *before* he knew that Young was a suspect, damaged his ability to impeach Arauz, and that had he known before trial of the same-day identification he might have pursued a defense of justification instead of denying his involvement.

The superior court denied the motion. It found that there was no violation of Rule 16 because the rule requires only disclosure of written or recorded witness statements, and Arauz's statement to Detective Elzey was neither written nor recorded; it also found that disclosure of Arauz's grand jury identification satisfied the requirements of the rule. The court further found that, even if there had been a violation of Rule 16, Young was not prejudiced because he knew from the grand jury testimony that Arauz would identify Young as the shooter. But the court offered to continue trial for a day to allow Young to further investigate the matter,[3] and it allowed the defense the option of excluding evidence that would corroborate Arauz's claim that he had made a same-day identification.

### 4. Young's defense

Young presented his alibi defense. His sister Angie testified that although she and Young were estranged and had not seen each other much in the years leading up to the shooting, she was with him that afternoon at his apartment. She testified that a person she knew as "Little O" came over during the afternoon and gave Young a gun. Young also presented evidence disputing his possession or ownership of the SUV, as well as evidence relating to the earlier gang disputes that implicated a different Crips faction than the one to which he belonged.

---

[3] The superior court said it was giving the defense "four days of investigation in response to the request for continuance," but the four days included a three-day holiday weekend, and Young's attorneys informed the court that their investigator might not be available on those days.

### 5.     Young's requested jury instructions

After the close of evidence, Young asked the court to give a jury instruction, based on case law from the Alaska Court of Appeals and other jurisdictions, that identified factors affecting the reliability of eyewitness identifications. Alternatively, Young asked the court to give the jury instruction approved by a federal appeals court in *United States v. Telfaire*.[4]  The superior court declined to give either one.  It found Young's customized instruction "more argument than it [was] a proposition of law," rejected the *Telfaire* instruction on the same grounds, and decided that the issues raised by the eyewitness identifications were fully addressed by the existing pattern jury instructions regarding the credibility of witnesses generally and the State's burden of proof.

The jury convicted Young on all counts.

### D.     Appeal To The Court Of Appeals And Petition For Hearing

Young appealed his conviction to the court of appeals.[5]  He argued first that the superior court erred when it failed to suppress Gazewood's identification under the standard set out in *Manson v. Brathwaite*.[6]  The court of appeals disagreed with the superior court in part, holding that the identification procedure had indeed been unnecessarily suggestive.[7]  But the court of appeals ultimately found no error in

---

[4]     469 F.2d 552 (D.C. Cir. 1972).

[5]     *Young v. State*, 331 P.3d 1276 (Alaska App. 2014).

[6]     *Id.* at 1278-80.

[7]     *Id.* at 1279-80 (discussing *Tegoseak v. State*, 221 P.3d 345 (Alaska App. 2009)).

admitting Gazewood's identification, concluding that it was nonetheless reliable under the totality of the circumstances.[8]

Young also argued that the superior court erred when it allowed Anzalone to make his in-court identification.[9] The court of appeals noted the superior court's reasoning: (1) "that it was not impermissible for a witness who failed to identify a defendant in a lineup to make an in-court identification later"; (2) "that Young could cross-examine Anzalone and bring out the factors that might cast doubt on Anzalone's identification"; and (3) that although Young was the only African-American man at the defense table, "in a criminal trial, the defendant is almost always the only person at the defense table aside from his attorney."[10] On this rationale, the court of appeals held "that the [superior] court did not abuse its discretion by permitting Anzalone to make an in-court identification."[11]

Young also challenged the superior court's failure to give either of his requested jury instructions on eyewitness testimony.[12] As the court of appeals noted, Young acknowledged "that this court has previously affirmed convictions where the trial court gave the pattern instruction instead of a more focused instruction on eyewitness identification";[13] the court of appeals "adhere[d] to those prior decisions and conclude[d]

---

[8] *Id*. at 1279-81.

[9] *Id.* at 1281.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

that the trial court did not abuse its discretion in giving the pattern jury instruction in this case."[14]

Finally, Young argued that the superior court erred when it refused to grant a mistrial based on the State's failure to disclose Arauz's same-day identification of Young as one of the assailants.[15] The court of appeals held that the superior court erred in deciding that the failure was not a discovery violation, because the prosecution's conduct "violated both the text and the spirit of Criminal Rule 16, which is designed to prevent precisely this type of unfair surprise."[16] It concluded, however, that the superior court had not erred in refusing to grant a mistrial, because Young had failed to show prejudice.[17] The court of appeals observed that "the major prejudice Young alleged" was that he might have abandoned his alibi defense for a defense of justification; it also observed, however, that a justification defense would have been "completely inconsistent" with either Young's alibi defense or the State's evidence.[18] Further, "Young did not make an offer of proof or ask to present information to the court *in camera* to establish that he had evidence to support the defense."[19] The court of appeals accordingly found no error in the superior court's denial of a mistrial.[20]

---

[14]     *Id.*

[15]     *Id.* at 1281-82.

[16]     *Id.* at 1282-83.

[17]     *Id.* at 1283.

[18]     *Id.*

[19]     *Id.*

[20]     *Id.*

Young filed a petition for hearing with this court. He urged us to abandon our reliance on *Manson v. Brathwaite*, "adopt a different test for the admission of eyewitness identification evidence under the Alaska Constitution," and reverse his conviction. He argued that even in the absence of a new test, Alaska law required that the Gazewood and Anzalone identifications be excluded. He also argued that the court of appeals erred by affirming the superior court's refusal to give his requested instructions and to grant a mistrial. We granted Young's petition.

## III.   STANDARD OF REVIEW

"The proper extent of appellate review for an unpreserved claim of constitutional error is a question of law that we review de novo."[21]  "We apply our independent judgment to any questions of law, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[22]

The determination whether an identification has been derived from unnecessarily suggestive identification procedures and, if so, whether it is nonetheless sufficiently reliable to be admitted at trial in conformance with due process is a mixed question of law and fact.[23]  On mixed questions we "review[] the superior court's factual findings for clear error, and the legal issues de novo."[24]

---

[21]     *Johnson v. State*, 328 P.3d 77, 81 (Alaska 2014).

[22]     *Brooks v. Horner*, 344 P.3d 294, 297 (Alaska 2015) (quoting *Holmes v. Wolf*, 243 P.3d 584, 588 (Alaska 2010)).

[23]     *See Cooper v. Bergeron*, 778 F.3d 294, 300 (1st Cir. 2015) (citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982)).

[24]     *Brown v. Knowles*, 307 P.3d 915, 923 (Alaska 2013) (alteration in original) (quoting *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009)).

"As long as the jury is properly instructed on the law, . . . the trial [judge] has broad discretion to determine whether to give instructions specially tailored to the case at hand."[25] "Issues involving the adequacy of jury instructions generally raise questions of law and are subject to de novo review."[26]

"[T]he trial court is vested with 'wide discretion' in determining whether a mistrial should be granted and its decision will be disturbed only if an abuse of discretion is shown."[27]

## IV. DISCUSSION

In its 2009 opinion in *Tegoseak v. State*, the court of appeals highlighted a number of weaknesses in the way courts, including Alaska's, have evaluated the reliability of eyewitness testimony in the decades since the United States Supreme Court's formative opinion in *Manson v. Brathwaite*.[28] Young contends that it is time for this court to take a similarly close look at the scientific evidence related to eyewitness identifications and to change the standards for determining their admissibility and the instructions that inform juries about how to assess their weight. As explained below, while we conclude that a change in the way we evaluate eyewitness identifications would not change the result in Young's case, we agree that a *Brathwaite*-based test fails to take into account the myriad factors now generally known to affect the reliability of

---

[25]     *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 29 (Alaska 1998); *see also* Alaska R. Crim. P. 30.

[26]     *Power Constructors, Inc.*, 960 P.2d at 29 (citing *Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 361 n.11 (Alaska 1996)).

[27]     *Amidon v. State*, 565 P.2d 1248, 1261 (Alaska 1977).

[28]     *Tegoseak v. State*, 221 P.3d 345, 350-63 (Alaska App. 2009) (discussing at length *Manson v. Brathwaite*, 432 U.S. 98 (1977)).

eyewitness evidence, and that such a test can no longer be viewed as consistent with Alaska's constitutional guarantee of due process.

> **A. Young's Challenges To The Eyewitness Identifications Admitted At Trial Do Not Require Reversal Of His Conviction**.

Young argues that it was error to admit the Gazewood and Anzalone identifications at trial. He first contends that because the test we use to evaluate eyewitness identifications is insufficiently protective of due process, we should adopt in its place a new test based in part on due process protections and in part on the Alaska Rules of Evidence. He also contends that it was error to admit the Gazewood and Anzalone identifications even under current law.

Young did not explicitly propose a new test for eyewitness identification evidence to the superior court or the court of appeals. Having arguably failed to preserve the issue, he urges us to adopt a "futility exception" to the preservation rule. We see no need to do so here. First, we conclude that it was error to admit Gazewood's identification of Young at trial even under the existing *Brathwaite* test, as we discuss below, though we also conclude that the error was harmless. Second, we conclude that it was not error to admit Anzalone's in-court identification and that our conclusion would not be different under a new, more protective test. Thus, the application of a new test for the admissibility of eyewitness identifications would not change the result in Young's case.

As noted above, however, we are nonetheless convinced that the *Brathwaite* test does not adequately screen out unreliable eyewitness identifications at trial and therefore does not adequately protect defendants' due process rights under the Alaska Constitution. We outline today the factors relevant to the admission of eyewitness identification testimony that courts should consider in future cases.

**1.** **Under the *Brathwaite* test it was error to allow Gazewood to identify Young as the driver — but that error was harmless.**

Nearly 50 years ago the United States Supreme Court decided that a pretrial identification procedure could be "so unnecessarily suggestive and conducive to irreparable mistaken identification that [a defendant] was denied due process of law" when the witness later testified at trial about the pretrial identification[29] or identified the defendant in court as the perpetrator.[30] We embraced these principles as consistent with the due process clause of the Alaska Constitution.[31]

In *Manson v. Brathwaite*, the Supreme Court clarified that an unnecessarily suggestive pretrial identification procedure does not require automatic exclusion of the

---

[29] *Stovall v. Denno*, 388 U.S. 293, 295, 302 (1967).

[30] *See Simmons v. United States*, 390 U.S. 377, 382-84 (1968).

[31] *See Buchanan v. State*, 561 P.2d 1197, 1204-05 (Alaska 1977) (discussing *Stovall*, 388 U.S. at 302 and *Simmons*, 390 U.S. at 382-84); *Klockenbrink v. State*, 472 P.2d 958, 961-62 (Alaska 1970) (discussing *Stovall*, 388 U.S. 293). Although our past cases have focused on the particular elements relevant to each case's facts rather than explaining the test comprehensively, *see, e.g.*, *Viveros v. State*, 606 P.2d 790, 792 & n.1 (Alaska 1980) (evaluating photographic lineup for suggestiveness and reliability and declining to adopt rule of per se exclusion because it "runs counter to the clear weight of authority in Alaska and the federal system"); *Holden v. State*, 602 P.2d 452, 455-57 (Alaska 1979) (examining identification derived from showup procedure for reliability according to *Brathwaite*, 432 U.S. at 114, without explicitly addressing unnecessary suggestiveness), the *Brathwaite* test has been accepted as consistent with the Alaska Constitution. *See also Anderson v. State*, 123 P.3d 1110, 1116 (Alaska App. 2005) ("[O]ur supreme court has never expressly rejected federal law on this subject (the law declared in *Stovall* and *Brathwaite*) in favor of a different rule adopted under our state constitution. Rather, the test in Alaska is the same one announced by the United States Supreme Court . . . .").

identification on due process grounds.[32]   Rather, "reliability is the linchpin in determining the admissibility of identification testimony."[33]  In determining reliability, "[t]he factors to be considered are set out in [*Neil v.*] *Biggers*" (the "*Biggers* factors"), which "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."[34]  "Against these factors is to be weighed the corrupting effect of the suggestive identification itself," evaluated in light of the totality of the circumstances.[35]

In this case, the superior court found that the procedure used for Gazewood's initial identification of Young (including the detective's comment to "trust your instincts" as Gazewood lingered over Young's photo) was not unnecessarily suggestive.  It also found that the identification was sufficiently reliable to be admitted even if the procedure *had* been unnecessarily suggestive.  The court of appeals held that the superior court erred in determining that the procedure was not unnecessarily suggestive but that the identification was nonetheless sufficiently reliable to be admitted.[36]  We agree with the court of appeals' first conclusion but disagree with its second.  We hold that in addition to being the product of an improperly suggestive procedure, Gazewood's identification was not sufficiently reliable to be admitted.

---

[32]   432 U.S. 98, 106-07, 114 (1977).

[33]   *Id.* at 114.

[34]   *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

[35]   *Id.*

[36]   *Young v. State*, 331 P.3d 1276, 1278-81 (Alaska App. 2014).

Accordingly, we hold that it was error to allow Gazewood to identify Young at trial as the driver.

### a. The procedure through which Gazewood identified Young as the driver was unnecessarily suggestive.

According to the State, the court of appeals erred in deciding that the procedure for Gazewood's pretrial identification was unnecessarily suggestive, because Gazewood had already chosen Young as the driver before the detective said to "trust your instincts." But the court of appeals rejected this argument,[37] and it was correct to do so. While Gazewood testified that he "was kind of going there" in selecting Young as the shooter and may well have picked Young anyway, he also testified that he took the detective's comment to mean "that's the guy we want you to pick" and that it ended his deliberations. He testified that what "stopped the process of me, . . . you know, looking at the photo identification was [the detective's] going trust your instinct. I mean, that ended this elimination process I was kind of . . . undergoing. . . . [T]hat certainly ended it." He agreed that the detective's comment was "pretty suggestive, yeah." We conclude that the court of appeals was correct to hold that the detective's comment made Gazewood's identification procedure "so suggestive as to create 'a very substantial likelihood of irreparable misidentification.' "[38]

---

[37] *See id.* at 1279-80 ("Although the superior court found that Gazewood had already decided to select Young before [the detective] told him, 'Go with your instincts,' the record does not support that finding.").

[38] *Noble v. State*, 552 P.2d 142, 146 (Alaska 1976) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

**b.** **It was error to hold that Gazewood's identification of Young was reliable despite the unnecessarily suggestive identification procedure.**

Though concluding that the identification procedure was unnecessarily suggestive, the court of appeals affirmed the admissibility of Gazewood's identification testimony because it determined that his identification of Young was nonetheless reliable under the *Brathwaite* test.[39] We conclude that this was error.

The court of appeals summarized the superior court's findings relating to the five *Biggers* factors, noted that "eyewitness testimony is often critical and is the kind of testimony that juries have traditionally been able to evaluate," and determined that "because of Gazewood's extensive prior experience with lineup procedure and his criticism of the procedure used in this case, his testimony was effective in establishing the problems with the photo lineup and the influence this procedure had on his identification."[40]

We agree that Gazewood's testimony — due to both his own expressed qualms about the identification process and an adept cross-examination — alerted the jury to a number of factors relevant to assessing the reliability of his identification of Young.[41] But under *Brathwaite* the testimony was not admissible unless the

---

[39] *Young*, 331 P.3d at 1280-81.

[40] *Id*.

[41] For example, in his testimony Gazewood volunteered the limitations on his ability to view the perpetrator at the scene ("I had, you know, about three seconds to look at someone in a rearview mirror."), his first impression that the driver was Samoan, his frustration with the detective's suggestive comment during the photo array, and his ultimate uncertainty ("I never said it's number four, I'm certain. . . . I think the . . . term I used is number four looks most like the guy."). The cross-examination emphasized
(continued...)

identification was reliable, and, following an unnecessarily suggestive identification procedure, a finding of reliability depends on an evaluation of the five *Biggers* factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."[42] We disagree that such an analysis supports the superior court's finding of reliability in this case.

Supporting the reliability of Gazewood's identification is "the length of time between the crime and the confrontation."[43] The three days that passed before Gazewood saw the photo array is longer than the time involved in other cases in which

---

[41](...continued)
Gazewood's limited opportunity to view the perpetrator, the distractions of the traffic light and other vehicles, Gazewood's starting assumption that the photo array included the person suspected by the police, notable differences among the photos used in the array, and the possibility that Gazewood's memory was influenced by the times he saw Young afterwards in court.

[42]     *Manson v. Brathwaite*, 432 U.S. 98, 114 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

[43]     *Biggers*, 409 U.S. at 199-200.

we addressed the reliability of eyewitness identifications,[44] but not so long as to weigh against a finding of reliability given the circumstances of this case.[45]

More weakly supporting reliability is the superior court's finding that Gazewood "had a sufficient degree of attention to the events"[46] because the fast approach of the vehicles in his rearview mirror put him on the alert. But Gazewood readily acknowledged the simultaneous distractions of the other cars stopped at the light, the changing signal, and having to watch for cross-traffic.

The remaining three *Biggers* factors weigh against a finding of reliability. Considering Gazewood's "level of certainty," the superior court found that his "conduct during the photo lineup and his demeanor while testifying suggest a significant degree of certainty." Lacking the trial judge's perspective on Gazewood's demeanor, we nonetheless note that Gazewood repeatedly declined to state definitively that Young was the man he had seen. He testified at the evidentiary hearing that when the detective said

---

[44] Those cases, however, largely involved showups immediately after the crimes. *See Walker v. State*, 652 P.2d 88, 95 (Alaska 1982) (identification reliable in part because "although the record is unclear as to the exact time lapse between the crime and the identification, it was less than two hours"); *Vessell v. State*, 624 P.2d 275, 279 (Alaska 1981) (identification reliable in part because "the show-up took place within minutes after the robbery had occurred"); *Howe v. State*, 611 P.2d 16, 18 (Alaska 1980) (identification reliable in part because witness "saw Howe again and identified him within less than two hours of the robbery"); *Holden v. State*, 602 P.2d 452, 457 (Alaska 1979) (identification reliable in part because taking place "no more than two hours after [the witness] first laid eyes on her assailant").

[45] *Cf. Biggers*, 409 U.S. at 201 ("There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases.").

[46] *See Brathwaite*, 432 U.S. at 114 (noting "the witness' degree of attention" as a factor to be considered in determining reliability).

"trust your instincts," he had narrowed his choice down to two photos that "looked vaguely familiar" — "I remember the two of them looked vaguely like the person that I saw" — and that even though the detective's comment terminated his deliberation with the choice of Young, he "[didn't] know necessarily where [he] would have wound up" otherwise. Describing his earlier identification of Young at the grand jury, Gazewood testified, "I said he looked . . . the most like the guy I saw that particular day." Throughout the evidentiary hearing he cautiously avoided stating that Young was definitely the man he had seen; his testimony shows at most a relative certainty that Young looked more like the perpetrator than did the other subjects he was shown.[47] We conclude that Gazewood's level of certainty does not support a finding of reliability.

Considering Gazewood's "opportunity . . . to view the criminal at the time of the crime,"[48] the superior court found that he was a "bona fide on the scene witness who had a good view of the events[,] . . . saw the events unfolding up close," and had

---

[47] *Cf. Walker*, 652 P.2d at 95 ("M.M.'s identification at the scene was certain and without hesitation or equivocation."); *Howe*, 611 P.2d at 18 (holding an identification reliable in part because the witness "stated that Howe was the man that robbed him 'without a doubt' "); *Holden*, 602 P.2d at 457 ("[The witness] testified at the omnibus hearing that she 'was positive' when she saw the photograph that the man depicted was her assailant. Officer Winkleman specified at that hearing that her identification was without hesitation or doubt.").

Based on its findings, the superior court may have considered Gazewood's confidence in his identification at the time of the evidentiary hearing. Although testifying to uncertainty during the identification procedure itself, Gazewood also testified at the hearing that he had seen Young's "picture in the paper a couple days ago" in connection with the pending trial and that the photo in the paper was "[m]ore similar to the person [he] recall[ed]" seeing at the shooting. The appropriate focus, however, is Gazewood's level of certainty at the time of the challenged identification procedure.

[48] *Brathwaite*, 432 U.S. at 114.

"three to eight seconds to witness [those] events." While these findings do reflect Gazewood's testimony, we also note that his brief view of the driver in his rearview mirror was not enough to give him confidence in his identification, as noted above; in fact, Gazewood cited these details to explain why he hesitated to say definitively it was Young. He readily admitted that while the SUV was coming up behind him the light changed, traffic started to move, and his focus was shifting back and forth. It is also worth noting that in Gazewood's quick sighting of the driver in his rearview mirror he identified him as Samoan (whereas Young is African American), identified the SUV as white (whereas Young's SUV was gray or silver), and failed to note the presence of any passenger (until the SUV had passed him, when he saw a hand with a gun extend from the passenger-side window and start shooting). Under the circumstances, we cannot agree that Gazewood's opportunity to view the perpetrator weighs in favor of the reliability of his identification.[49]

Finally, with regard to "the accuracy of [the witness's] prior description of the criminal,"[50] the superior court found significant that Gazewood had previously identified the shooter as a "Black or Samoan man who had his hair pulled back." This factual finding, however, is clearly erroneous: while Gazewood consistently recalled that the driver's hair was "pulled back," he initially described the man not as "Black or

---

[49] *Cf. United States v. Meyer*, 359 F.3d 820, 925-26 (6th Cir. 2004) (holding that the first *Biggers* factor, the witness's opportunity to view the perpetrator, weighed heavily in favor of reliability when the witness, the driver of a postal truck during a holdup, observed the perpetrator "at close range" for "between two and four minutes" and had a "conversation" with him about the cash box and the truck keys).

[50] *Brathwaite*, 432 U.S. at 114.

Samoan" but as "Samoan."[51]  And other than the pulled-back hair and "kind of a round face," the record does not reflect that Gazewood could or did describe the driver's facial features, clothing, or other distinguishing characteristics.  While Gazewood's initial description of the driver may have matched Young in a very general sense, we conclude that it was not accurate or specific enough to support a finding that his later selection of Young's photograph was reliable.[52]

The *Brathwaite* test requires that we weigh the five *Biggers* factors "[i]n light of the totality of the circumstances" against "the corrupting effect of the suggestive identification itself."[53]  Given that only two of the *Biggers* factors provide only modest support for a finding of reliability, we conclude that they cannot overcome the unnecessary suggestiveness of the photo array.  We therefore hold that it was error to admit Gazewood's identification of Young at trial.

---

[51]  We note Gazewood's later trial testimony that when he first contacted the police, "I had said that the person was — was Samoan or maybe black, I think."  But at the evidentiary hearing, when the court was determining whether Gazewood's identification could be considered by the jury, Gazewood testified consistently that he first thought the driver was Samoan.  He recalled telling the investigating detective, either on the phone or when he came to Gazewood's office with the photo array, that he thought the driver "was of Samoan descent."

[52]  *Cf. Vessell v. State*, 624 P.2d 275, 279 (Alaska 1981) ("The description that [the witnesses] gave to the police immediately after the robbery was detailed and accurate, although they differed slightly on the exact type of boots that the robber wore. . . .  Finally, both [witnesses] were positive in their statements that [the defendant] wore the same clothing as the man that robbed them, although neither claimed that he could recognize [the defendant's] facial features.").

[53]  *Holden v. State*, 602 P.2d 452, 456-57 (Alaska 1979).

### c. The error in admitting Gazewood's identification at trial was harmless.

We conclude, however, that the error in admitting the evidence of Gazewood's identification was harmless beyond a reasonable doubt.[54] The admission of an unreliable eyewitness identification at trial is harmless "if there [is] conclusive independent evidence, apart from the [unreliable] identification testimony[,] . . . that identified [the defendant] as the [culprit]."[55]

In prosecuting Young, the State did not rely solely on Gazewood's identification; two other eyewitnesses placed Young at the scene. Arles Arauz, who had known Young since high school, identified him as the driver of the SUV. John Anzalone, another driver near the shooting, positively identified Young as the driver. And significant circumstantial evidence tied Young to the crime. The key in his pocket when he was arrested was found to operate the SUV the State alleged was used in the shooting. The State's witnesses identified the SUV as belonging to "Big Nasty," a nickname for Young. The nine-millimeter Luger pistol Young was carrying when he was arrested was shown to match bullet casings found at the crime scene.

In assessing whether the erroneous admission of Gazewood's identification was harmless, we also find significant the extent to which he qualified his own testimony by emphasizing the brevity of his opportunity to view the perpetrator and his frustration with what he considered to be a suggestive comment at the photo array.[56] Admission of

---

[54] *See Raphael v. State*, 994 P.2d 1004, 1010 (Alaska 2000) ("A constitutional error is ground for reversal of conviction unless the error is 'harmless beyond a reasonable doubt.' ").

[55] *McCracken v. State*, 521 P.2d 499, 504-05 (Alaska 1974).

[56] *See supra* note 41.

a weak and equivocal identification is more likely to be harmless error than admission of a strong and confident one.[57]

Thus, despite the error in admitting Gazewood's identification, the fact that there was "conclusive independent evidence, apart from the [unreliable] identification testimony,"[58] implicating Young in the shooting leads us to conclude that the error was harmless beyond a reasonable doubt.

### 2. It was not error to allow Anzalone to identify Young in court.

Young also argues that it was error to permit Anzalone, who had failed to identify him at the grand jury, to identify him at trial as the driver after having seen his photo on the television news. We conclude that this was not error.

---

[57] *See Williams v. Stewart*, 441 F.3d 1030, 1039 (9th Cir. 2006) (holding that any error in admitting evidence of suggestive showup was harmless where "[c]ross-examination brought out the weakness of [the witness's] identification, the suggestiveness of the circumstances under which it was made, the few seconds she had to see the suspect to begin with, the fact that she had been unable to pick [the defendant] out of the photo array, and the two and a half years that had elapsed between her five second encounter on [the date of the incident] and the deposition at which she identified [the defendant]"); *United States v. Washington*, 353 F.3d 42, 45-46 (D.C. Cir. 2004) (holding that any error in admitting evidence of suggestive lineup was harmless beyond a reasonable doubt where, among other reasons, "the potential impact on the jury of [the] lineup identification was slight because it was, at best, equivocal; she said only that her assailant 'might be number two,' " and defense counsel "denigrated" the identification in cross-examination and closing argument as "the unreliable product of a suggestive procedure"); *State v. Conyers*, 236 S.E.2d 393, 396 (N.C. App. 1977) ("[The witness's] in-court identification testimony before the jury in this case was so weak [—] she testified only that defendant 'resembles one of the guys who went to the back' [—] and the other evidence of defendant's guilt, including his signed confessions[,] was so overwhelming, that the admission of her testimony, if error at all, was harmless beyond any reasonable doubt.").

[58] *McCracken,* 521 P.2d at 504-05.

**a.** **Due process protections against unnecessarily suggestive identifications do not apply to Anzalone's initial identification of Young after seeing his picture on television.**

Young argues first that Anzalone's identification of him after seeing his picture on the television news constitutes an unnecessarily suggestive identification procedure and that the superior court should have assessed its reliability under the *Brathwaite* test before allowing Anzalone to identify Young in court. But the due process protections against unnecessarily suggestive identification procedures do not apply in the absence of state action.[59] As the United States Supreme Court has recently held, the "due process check on the admission of eyewitness identification [is] applicable *when the police have arranged suggestive circumstances* leading the witness to identify a particular person as the perpetrator of a crime."[60]

> When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification

---

[59]     *Nichols v. Eckert*, 504 P.2d 1359, 1362 (Alaska 1973) ("For [the due process] clause to apply there must be state action and the deprivation of an individual interest of sufficient importance to warrant constitutional protection."); *cf. Perry v. New Hampshire*, 132 S. Ct. 716, 730 (2012) ("[T]he [federal] Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.").

[60]     *Perry*, 132 S. Ct. at 720 (emphasis added).

and the requirement that guilt be proved beyond a reasonable doubt.[61]

Consistent with these principles, we held in *Kimble v. State* that accidental confrontations do not ordinarily implicate due process concerns.[62] Such a confrontation "may be the subject of cross-examination of course, but on the whole the question is one going to the weight rather than the admissibility of the evidence."[63] While the facts in *Kimble* — where the police were alleged to have arranged an "accidental" showup with the witness — made for a close question,[64] this is not such a case. Because there was no state action involved in Anzalone's identification of Young from a picture on the television news, due process did not require that the superior court screen it for reliability under *Brathwaite*.

  **b. Due process protections against unnecessarily suggestive eyewitness identifications do not apply to Anzalone's first-time in-court identification.**

Young also argues that Anzalone's in-court identification of him was itself unnecessarily suggestive because it "was equivalent to a show-up, where an individual is presented with one suspect and asked to make a yes or no identification." Young

---

[61] *Id.* at 721.

[62] 539 P.2d 73, 77 (Alaska 1975).

[63] *Id.* In *Kimble*, the defendant challenged an in-court identification after the witness, present at the police station on an unrelated matter, had identified the defendant as he was being led into a holding cell. *Id.* at 76-77. While Kimble claimed that admission of the in-court identification would violate his right to due process, we held that "[t]o extend the Wade-Stovall line of cases to purely accidental pretrial confrontations would place too great a burden on police and prosecutors to isolate witnesses and defendants." *Id.* at 77.

[64] *See id.* at 77.

observes that he was the only African-American man in the courtroom and that he was sitting at counsel table with his lawyer. He contends that given the suggestiveness of these circumstances, the superior court should have assessed the reliability of the resulting identification under *Brathwaite* and should have excluded it.

We have never directly addressed whether a first-time in-court identification triggers application of the same due process protections that apply to suggestive pretrial identifications.[65] We now decide it does not. Our conclusion is driven by the fundamental differences between identifications derived from state action prior to trial and those that occur in the courtroom. A pretrial identification ordinarily involves only the police and the witness, and how the identification is later evaluated at trial depends largely on those participants' recollections of it. An in-court identification, in contrast, occurs in the presence of the judge, the jury, and the lawyers. The circumstances under which the identification is made are apparent. Defense counsel has the opportunity to identify firsthand the factors that make the identification suggestive and to highlight them for the jury.[66] We also note that there are other ways, though not

---

[65]    This court and the court of appeals have both declined to reach the issue of an allegedly suggestive in-court identification after finding that a consistent pretrial identification was proper. *See Viveros v. State*, 606 P.2d 790, 793 (Alaska 1980) ("Because we have concluded that the pre-trial identification was proper, it is unnecessary to consider whether the in-court identification was permissible in the wake of an impermissible pre-trial identification."); *Dunbar v. State*, 677 P.2d 1275, 1278 n.1 (Alaska App. 1984) ("Our holding that the photographic lineup was not impermissibly suggestive . . . disposes of [the defendant's] claim with respect to the in-court identification.").

[66]    *See People v. Rodriguez*, 480 N.E.2d 1147, 1151 (Ill. App. 1985) ("Where a witness first identifies the defendant at trial, defense counsel may test the perceptions, memory and bias of the witness, contemporaneously exposing weaknesses and adding
(continued...)

used in this case, in which the risks of in-court misidentifications can be either minimized in practice or pointed out to the jury. Expert witnesses can testify about the problems inherent in first-time in-court identifications;[67] the trial court may grant a defendant's request for an in-court lineup or to be seated somewhere other than counsel table for the identification.[68]

We recognize that this is a close question, and by our decision today we do not mean to foreclose the possibility that a first-time in-court identification could be unnecessarily suggestive. For example, courts have found due process violations where the prosecutor improperly coached the witness into making an in-court identification.[69]

---

[66](...continued)
perspective in order to lessen the hazards of undue weight or mistake."). Here, Young's attorneys cross-examined Anzalone vigorously on the circumstances of the identification and his failure to identify Young earlier.

[67]  In this case, Young sought to introduce expert testimony about the fallibility of eyewitness identifications, but the superior court refused to allow it on grounds that the State had not received adequate notice. Young did not challenge that decision on appeal.

[68]  *See, e.g.*, *United States v. Thompson*, 524 F.3d 1126, 1136 (10th Cir. 2008) ("[A]lthough the district court offered Mr. Thompson the opportunity to use an in-court line-up or photos to lessen the suggestiveness of the in-court identification, he was not constitutionally entitled to such methods and, in any event, did not take advantage of them."); *United States v. Domina*, 784 F.2d 1361, 1369 (9th Cir. 1986) ("There is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room. These are matters within the discretion of the court.").

[69]  *See United States v. Greene*, 704 F.3d 298, 307 (4th Cir. 2013) (holding that due process was violated "where the phrasing of a question suggest[ed] the desired response" and "the witness understandably may have felt pressure to find something in the defendant that reminded her of the bank robber," thereby presenting "a suggestive
(continued...)

In this case, however, Anzalone volunteered his identification of Young. The prosecutor simply asked him whether he could "give us any description of the person that you saw," to which Anzalone answered, "He's in the courtroom today." The prosecutor asked, "Do you recognize him?" and Anzalone responded, "He's sitting at the defense table."

We emphasize that the due process protections that have been developed around the admissibility of eyewitness identifications, and which we clarify today, are intended to correct for unnecessarily suggestive police conduct during its investigation, and that courtrooms have a number of other safeguards — impartial judge and jury, competent defense counsel, the rules of evidence, the State's burden of proof — that are intended to ensure due process.[70] While recognizing that the suggestiveness and reliability of first-time in-court identifications present many of the same issues as those that affect pretrial identifications, we are not prepared to extend the same rules to both. We conclude that the superior court did not err when it allowed Anzalone to identify Young in court as the driver.

---

[69](...continued)
situation in which it is not clear whether the witness's own recollections, or outside pressures, are driving the testimony"); *Bennett v. Miller*, 419 F. App'x 18, 20 (2d Cir. 2011) ("[The witness] never identified [the defendant] prior to trial; he twice failed to make an in-court identification while on the stand; and only after he watched from the galley when the prosecutor identified [the defendant] as the shooter did [the witness] undertake to make an in-court identification.").

[70]      *See Perry v. New Hampshire*, 132 S. Ct. 716, 728-29 (2012) (listing "other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability," including the right to confront witnesses, the right to counsel, eyewitness-specific jury instructions, the evidence rules excluding relevant but unfairly prejudicial evidence, and expert testimony).

3. **Because the *Brathwaite* test does not adequately protect the right to due process under the Alaska Constitution, we adopt a new approach to deciding the admissibility of eyewitness identification evidence in future cases.**

Although the result in Young's case is unaffected by a prospective change in the law, we are convinced that Alaska's existing test for the admission of eyewitness identifications does not go far enough in protecting the right to due process under the Alaska Constitution. We generally refrain from issuing advisory opinions,[71] but at times we set aside this judicial policy of self-restraint to correct or clarify important aspects of the law.[72] In the exercise of our general "supervisory power to formulate standards for the enforcement of criminal law in the courts of this state"[73] and our more specific "supervisory powers over state courts pertaining to the admissibility of evidence,"[74] we

---

[71]     *Larson v. State*, 254 P.3d 1073, 1078 (Alaska 2011).

[72]     *See, e.g.*, *Lyons v. Midnight Sun Transp. Servs., Inc.*, 928 P.2d 1202, 1204-05 (Alaska 1996) (finding that "any possible error resulting from the use of [a] sudden emergency instruction" was harmless but "tak[ing] this opportunity to disapprove of the instruction's further use," with an in-depth discussion of the issue); *Moreau v. State*, 588 P.2d 275, 283-84 (Alaska 1978) (holding that a codefendant voluntarily waived his Sixth Amendment right to individual counsel but requiring trial courts to apply stricter standards for dual representation in future cases, modeled after Minnesota precedent); *Thurlkill v. State*, 551 P.2d 541, 544-45 & n.9 (Alaska 1976) (finding no reversible error in a presentence report's reliance on unverified police contacts but instructing trial courts in future cases to expressly state that they are not relying on those contacts in sentencing, and also "urg[ing] that the probation personnel act responsibly in this area").

[73]     *Simms v. State*, 464 P.2d 527, 528 (Alaska 1970) (exercising supervisory power to advise trial courts about limiting jurors' access to materials beyond what was admitted in evidence).

[74]     *Roman v. State*, 570 P.2d 1235, 1243-44 (Alaska 1977) (exercising supervisory power to require that conditions of parole authorizing warrantless searches
(continued...)

today announce a new test for the admissibility of eyewitness identification testimony that we believe is consistent with the due process protections of Alaska's constitution.

In so doing we necessarily depart from *Manson v. Brathwaite* and the Alaska cases that relied on it as the touchstone. "We do not lightly overrule our past decisions."[75] However, "stare decisis is a practical, flexible command that balances our community's competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands."[76] With these considerations in mind, "we will overrule a prior decision only when ' "clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent." ' "[77] We are convinced that this is the case with respect to the *Brathwaite* test.

### a. Changed conditions justify replacing the *Brathwaite* test.

The "changed conditions" that justify abandoning a prior decision include where "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application."[78] Developments in the science related to the reliability of eyewitness identifications, and

---

[74](...continued)
"be specified by the Parole Board and not left to the discretion of individual parole officers").

[75]     *State v. Dunlop*, 721 P.2d 604, 610 (Alaska 1986).

[76]     *State v. Carlin*, 249 P.3d 752, 757 (Alaska 2011) (alteration omitted) (quoting *Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173, 1175 (Alaska 1993)).

[77]     *Pratt & Whitney*, 852 P.2d at 1176 (quoting *Dunlop*, 721 P.2d at 610).

[78]     *Id.* (alteration in original) (quoting *Planned Parenthood v. Casey*, 505 U.S. 833, 855 (1992)).

courts' responses to those developments, have significantly weakened our confidence in the *Brathwaite* test as a tool for preventing the admission of unreliable evidence at trial, and therefore its capacity for protecting the due process rights afforded by the Alaska Constitution.[79]

The State aptly observes that doubts about the reliability of eyewitness identifications are neither "revelatory nor recent." The United States Supreme Court noted even before *Brathwaite* that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification," and "[t]he hazards of such testimony are established by a formidable number of instances in the records of English and American trials."[80] But "the hazards of such testimony" are even more well documented since *Brathwaite*.

*Brathwaite* was decided in 1977, and "[t]he modern era of eyewitness identification research began" more or less contemporaneously, "in the 1970s."[81] But "[t]he past few decades have seen an explosion of additional research that has led to important insights into how vision and memory work, what we see and remember best,

---

[79] In *Perry v. New Hampshire*, the United States Supreme Court reaffirmed its reliance on *Brathwaite* under the United States Constitution. 132 S. Ct. 716, 723-25 (2012). But while "[t]he Federal Constitution protects the due process rights of all Americans, . . . federal law does not preclude the Alaska Constitution from providing more rigorous protections for the due process rights of Alaskans." *Doe v. State, Dep't of Pub. Safety*, 92 P.3d 398, 404 (Alaska 2004).

[80] *United States v. Wade*, 388 U.S. 218, 228 (1967).

[81] NAT'L ACAD. OF SCI., IDENTIFYING THE CULPRIT: ASSESSING EYEWITNESS IDENTIFICATION 16 (2014) [hereinafter IDENTIFYING THE CULPRIT].

and what causes these processes to fail."[82]   The Supreme Court of New Jersey comprehensively surveyed the literature in a 2011 opinion that we find particularly persuasive.  The court assigned a special master to consider the scientific evidence on eyewitness identifications and, after receiving the master's report, summarized: "Virtually all of the scientific evidence considered on remand emerged after [*Brathwaite*]," and, while the 1970s "produced only four published articles in psychology literature containing the words 'eyewitness' and 'identity' in their abstracts[, . . .] more than two thousand studies related to eyewitness identification have been published in the past thirty years."[83]

The State contends that we should not consider scientific evidence that was not subjected to the adversarial process at trial.  We "recognize that evaluation of scientific information at the appellate level is without the advantage of cross-examination."[84] Other states' high courts have followed different procedural paths when modifying their standards for evaluating eyewitness identifications.  The special master appointed by the New Jersey Supreme Court "to evaluate scientific and other evidence about eyewitness identifications . . . presided over a hearing that probed testimony by seven experts and produced more than 2,000 pages of transcripts along with hundreds of scientific studies," then issued an extensive report on which the court

---

[82]   *Id.* at 69.

[83]   *State v. Henderson*, 27 A.3d 872, 892 (N.J. 2011); *see also* REPORT OF THE SPECIAL MASTER, State v. Henderson, A-8-08, at 8-14 (N.J. June 18, 2010), https://www.judiciary.state.nj.us/pressrel/HENDERSON%20FINAL%20BRIEF%20. PDF%20(00621142).PDF.

[84]   *State v. Erickson*, 574 P.2d 1, 6 (Alaska 1978).

heavily relied.[85] Other courts, acknowledging the scientific consensus, have not required that the science be tested again in a trial-like process. The Massachusetts Supreme Judicial Court convened a "Study Group" in 2011 to determine how it could improve its model jury instructions for the evaluation of eyewitness identifications.[86] In 2015 the court "review[ed] the scholarly research, analyses by other courts, amici submissions, and the Study Group Report and comments" and adopted new standards.[87] The supreme courts of Connecticut,[88] Hawai'i,[89] Oregon,[90] Utah,[91] and Wisconsin,[92] while noting

---

[85]     *Henderson*, 27 A.3d at 877.

[86]     *See Commonwealth v. Walker*, 953 N.E.2d 195, 208 n.16 (Mass. 2011) (convening study group "to consider how we can best deter unnecessarily suggestive procedures and whether existing model jury instructions provide adequate guidance to juries in evaluating eyewitness testimony"); *see also* SUPREME JUDICIAL COURT STUDY GROUP ON EYEWITNESS EVIDENCE, REPORT AND RECOMMENDATIONS TO THE JUSTICES (2013), http://www.mass.gov/courts/docs/sjc/docs/eyewitness-evidence-report-2013.pdf.

[87]     *Commonwealth v. Gomes*, 22 N.E.3d 897, 905, 909-10 (Mass. 2015).

[88]     *State v. Guilbert*, 49 A.3d 705, 720-22 (Conn. 2012) (holding that expert testimony should be allowed on the reliability of eyewitness identifications; relying both on "[t]he extensive and comprehensive scientific research, as reflected in hundreds of peer reviewed studies and meta-analyses, [which] convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification," and on the fact that courts nationwide have followed this science in revising their approaches to eyewitness testimony).

[89]     *State v. Cabagbag*, 277 P.3d 1027, 1035-38 (Haw. 2012) (describing other states' adoption of new standards for the evaluation of eyewitness testimony but concluding that "[m]ost significantly, the impetus for a change in our approach lies in the empirical research that reveals that people generally do not understand all of the factors that affect the reliability of an eyewitness identification").

[90]     *State v. Lawson*, 291 P.3d 673, 685 (Or. 2012) (en banc) ("Based on our

(continued...)

judicial trends, have also relied directly on the scientific research to explain why their standards should be modified.

We consider it unnecessary to retest the validity of the scientific evidence on which these other high courts rely. We are not relying on disputed scientific evidence to disturb or affirm the verdict in this case, but rather identifying factors for trial courts' future use — factors other courts have found highly relevant to their constitutional guarantees of due process. We adopted the *Brathwaite* test of reliability in 1979 without reference to whether its assumptions were scientifically valid.[93] In the decades that followed we applied a "totality of the circumstances" test that included the *Biggers*

---

**90**(...continued)
extensive review of the current scientific research and literature, we conclude that the scientific knowledge and empirical research concerning eyewitness perception and memory has progressed sufficiently to warrant taking judicial notice of the data contained in those various sources as legislative facts that we may consult for assistance in determining the effectiveness of our existing test for the admission of eyewitness identification evidence.").

**91**    *State v. Clopten*, 223 P.3d 1103, 1108 (Utah 2009) (concluding that a cautionary instruction was not enough of a safeguard and that expert testimony on eyewitness identifications should generally be admitted as well; relying directly on scientific research, though noting: "That the empirical data is conclusive on these matters is not disputed by either party in this case and has not been questioned by this court in [its] decisions [since 1986, when the court first acknowledged the inherent weaknesses of eyewitness identification]").

**92**    *State v. Dubose*, 699 N.W.2d 582, 591-92 (Wis. 2005) (deciding that showups are inherently suggestive; revisiting reliance on *Biggers* and *Brathwaite* in light of subsequent "extensive studies on the issue of identification evidence, research that is now impossible for us to ignore").

**93**    *Holden v. State*, 602 P.2d 452, 456 (Alaska 1979) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

factors because the Supreme Court had decided those factors were relevant.[94]  As our sister courts find reason to be dissatisfied with *Brathwaite* and the *Biggers* factors, it is appropriate that we take note of their concerns and use their reasoning to inform our own constitutional analysis.  We find highly significant the extent to which other courts have reviewed the evidence, accepted it as valid, and filtered it through their own constitutional analyses.

Ultimately, the movement away from the *Brathwaite* test in other jurisdictions, in reliance on advances in the relevant research, convinces us that conditions have changed.[95]  We conclude that "the legal landscape is very different than it was" when we decided to follow *Brathwaite* 37 years ago, and "[t]his new diversity of opinions among the high courts of states throughout the country is another reason to conclude that the 'changed conditions' element of the test for overruling precedent is satisfied."[96]

---

[94]     *See, e.g.*, *Vessell v. State*, 624 P.2d 275, 279 (Alaska 1981).

[95]     *See, e.g.*, *State v. Carlin*, 249 P.3d 752, 758, 761 (Alaska 2011) (considering "the growing number of states that have rejected" a proposition of law in holding that "the 'changed conditions' element of the test for overruling precedent is satisfied"); *Tegoseak v. State*, 221 P.3d 345, 359 (Alaska App. 2009) ("The year 2005 appears to have been a turning point of sorts in the judicial recognition of the growing body of research into the psychological dynamics of eyewitness identification.").

[96]     *Carlin*, 249 P.3d at 760-61; *see also Charles v. State*, 326 P.3d 978, 984 n.58 (Alaska 2014) ("Our conclusion today that *Judd* was erroneous is bolstered by changed conditions. . . .  [I]n *Judd* we were persuaded in part to adopt the *Linkletter* criteria because of their universal acceptance. . . .  But after *Griffith* it is no longer true that the weight of authority supports *Linkletter* for direct review retroactivity." (internal citations omitted)).

We also conclude that "more good than harm would result from a departure from" the *Brathwaite* test.[97] "It is indisputable that a primary goal, perhaps the paramount goal, of the criminal justice system is to protect the innocent accused against an erroneous conviction,"[98] and we cannot doubt that mistaken eyewitness identifications lead to wrongful convictions.[99] Justice Sotomayor, dissenting in *Perry v. New Hampshire*, noted that "[t]he empirical evidence demonstrates that eyewitness "misidentification is ' "the single greatest cause of wrongful convictions in this country." ' "[100] Even the majority opinion in *Perry* "d[id] not doubt either the importance or the fallibility of eyewitness identifications."[101] And the risks posed by the admission of unreliable identifications is magnified by the effect eyewitness testimony has on the jury: as Justice Brennan noted, "[T]here is almost nothing more convincing

---

[97]    *Carlin*, 249 P.3d at 757. In making this determination, we "balance the benefits of adopting a new rule against the benefits of stare decisis: providing guidance for the conduct of individuals, creating efficiency in litigation by avoiding the relitigation of decided issues, and maintaining public faith in the judiciary." *Id.* at 761-62.

[98]    *Shaw v. State, Dep't of Admin.*, 861 P.2d 566, 570 (Alaska 1993).

[99]    *See, e.g.*, Samuel R. Gross et. al., *Exonerations in the United States 1989 Through 2003*, 95 J. CRIM. L. & CRIMINOLOGY 523, 542 (2005) ("The most common cause of wrongful convictions is eyewitness misidentification."); *Tegoseak*, 221 P.3d at 360 ("The changing attitude of the legal system is attributable to the fact that 'the development of forensic DNA testing in the 1990s [uncovered] definitive cases of the conviction of innocent people in the United States', and that '[e]yewitness identification error was at the heart of the evidence used to convict the vast majority of these innocent people.' " (alterations in original) (quoting Kevin Johnson, *States Change Police Line-ups After Wrongful Convictions*, USA TODAY, Sept. 17, 2009)).

[100]    132 S. Ct. 716, 738-39 (2012) (Sotomayor, J., dissenting) (quoting *State v. Henderson*, 27 A.3d 872, 885 (N.J. 2011)).

[101]    *Id.* at 728.

than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!' "[102]

In sum, we are convinced that the *Brathwaite* test does not adequately assess the reliability of eyewitness identifications and thus allows the admission of very persuasive evidence of doubtful reliability. In the belief that a new approach — based on a better understanding of the factors affecting the reliability of eyewitness identifications — will lead to the exclusion of unreliable evidence and thereby reduce the risk of wrongful convictions, we conclude that breaking away from our long reliance on the *Brathwaite* test will do more good than harm.[103]

**b.      The scientific understanding of the factors affecting eyewitness identifications has evolved since *Brathwaite*.**

The science of human memory developed since *Brathwaite* shows that memory does not function like a videotape, on which events are simply stored linearly to be recalled later in the same linear way.[104] Instead, there are three major stages of memory and recall. First, in the acquisition stage, "the event is perceived by a witness, and information is entered into the memory system"; second, in the retention stage, "some time passes before a witness tries to remember the event"; finally, in the retrieval

---

[102]      *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) (emphasis omitted) (quoting ELIZABETH LOFTUS, EYEWITNESS TESTIMONY 19 (1979)).

[103]      *See Henderson*, 27 A.3d at 928 ("At the core of our system of criminal justice is the 'twofold aim . . . that guilt shall not escape or innocence suffer.' " (alteration in original) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935))).

[104]      *See* ELIZABETH F. LOFTUS ET AL., EYEWITNESS TESTIMONY: CIVIL AND CRIMINAL § 2:2 (5th ed. 2014).

stage, "the witness tries to recall the stored information."[105]  Eyewitness memory is malleable, and many factors can affect the reliability of a memory at each stage of the process of recalling it.[106]  And as the court of appeals noted in *Tegoseak v. State*, a mistaken identification at the beginning of a criminal investigation can "become" the witness's memory for purposes of all subsequent identifications; the erroneous picture displaces the fact.[107]

Scientific literature often divides the factors that can affect the reliability of eyewitness identifications into two categories:  "system variables," which are manipulable and can be influenced by the criminal justice system (such as the instructions given a witness during a lineup); and "estimator variables," which cannot be influenced by the criminal justice system because they are related to environmental conditions and personal characteristics (such as the stress of the moment).[108]  In replacing the *Biggers* factors with a list that draws on these two categories of variables, we follow most closely the New Jersey and Oregon supreme courts' decisions in *State v.*

---

[105]     *Id.*

[106]     *Id.*; Steven Penrod et al., *The Reliability of Eyewitness Testimony:  A Psychological Perspective*, *in* THE PSYCHOLOGY OF THE COURTROOM 119, 122-46 (Norbert L. Kerr & Robert M. Bray eds., 1982).

[107]     221 P.3d 345, 355 (Alaska App. 2009) (citing Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science:  Thirty Years Later*, 33 LAW & HUM. BEHAVIOR 1-24 (2009)).

[108]     Gary L. Wells, *Applied Eyewitness–Testimony Research: System Variables and Estimator Variables*, 36 J. PERSONALITY & SOC. PSYCHOL. 1546, 1548 (1978); IDENTIFYING THE CULPRIT, *supra* note 81, at 119.

*Henderson*[109] and *State v. Lawson*.[110]  Like those courts, we recognize that the science of eyewitness identifications is "probabilistic"; it cannot say for certain whether any particular identification is accurate but rather identifies the variables that are relevant to evaluating the risk of a misidentification.[111]

### *System Variables*

#### i.    **Blind administration**[112]

*Was the lineup or photo array administered "blind"?*    When the administrator of an identification procedure knows who the suspect is, the administrator may subconsciously affect the reliability of the witness's identification.[113]  Such

---

[109]    27 A.3d 872, 894-910 (N.J. 2011).

[110]    291 P.3d 673, 685-88 (Or. 2012) (en banc).

[111]    *See Henderson*, 27 A.3d at 894 ("[E]yewitness identification research remains probabilistic, meaning that science cannot say whether an identification in an actual case is accurate or not.  Instead, science has sought to answer, in the aggregate, which identification procedures and external variables are tied to an increased risk of misidentification."); *Lawson*, 291 P.3d at 685 ("We recognize that the scientific research is 'probabilistic' — meaning that it cannot demonstrate that any specific witness is right or wrong, reliable or unreliable, in his or her identification. . . . [But] it is imperative that law enforcement, the bench, and the bar be informed of the existence of current scientific research and literature regarding the reliability of eyewitness identification . . . .").

[112]    *See Henderson*, 27 A.3d at 896-97; *Lawson*, 291 P.3d at 686.

[113]    *See Lawson*, 291 P.3d at 706 ("To guard against [unintentional] influence, experts recommend that all identification procedures be conducted by a 'blind' administrator — a person who does not know the identity of the suspect."); *see also* Sarah M. Greathouse & Margaret Bull Kovera, *Instruction Bias and Lineup Presentation Moderate the Effects of Administrator Knowledge on Eyewitness Identification*, 33 LAW & HUM. BEHAV. 70, 71 (2009) ("[P]olice officers may leak their hypotheses by consciously or unconsciously communicating to witnesses which lineup member is the suspect.").

influences are referred to as "interpersonal expectancy effects":[114] "the tendency for experimenters to obtain results they expect . . . because they have helped to shape that response."[115] In the eyewitness identification context, this can occur when the administrator of a lineup or photo array knows which person is the suspect and, consciously or not, gives cues to the witness that affect the witness's choice.[116] The phenomenon is not limited to overt or explicit suggestion; "[e]ven small changes in the experimenter's body posture or expression have been shown to affect participants' responses," though the witness is often unaware that it is happening.[117]

---

[114] *See, e.g.*, Jacqueline L. Austin et al., *Double-Blind Lineup Administration: Effects of Administrator Knowledge on Eyewitness Decisions*, *in* REFORM OF EYEWITNESS IDENTIFICATION PROCEDURES 139, 139-40 (Brian L. Cutler, ed. 2013).

[115] Robert Rosenthal & Donald B. Rubin, *Interpersonal Expectancy Effects: The First 345 Studies*, 3 BEHAV. & BRAIN SCI. 377, 377 (1978) ("The overall probability that there is no such thing as interpersonal expectancy effects is near zero."). The court of appeals illustrated this phenomenon in *Tegoseak v. State* with a description of the investigation over a hundred years ago into the arithmetical abilities of a trick horse, "Clever Hans," who, it was determined, responded to unwitting visual cues from his master. 221 P.3d 345, 351 n.7 (Alaska App. 2009).

[116] *See* Austin et al., *supra* note 114, at 139-42. "When the administrator knows the suspect's identity . . . , the witness may be more likely to choose the suspect regardless of the suspect's guilt." *Id.* at 142.

[117] Ryann M. Haw & Ronald P. Fisher, *Effects of Administrator-Witness Contact on Eyewitness Identification Accuracy*, 89 J. APPLIED PSYCHOL. 1106, 1110 (2004); *see also id.* at 1107; Steven E. Clark et al., *Lineup Administrator Influences on Eyewitness Identification Decisions*, 15 J. EXPERIMENTAL PSYCHOL.: APPLIED 63, 72-74 (2009).

To prevent these influences on the identification procedure, studies recommend that it be administered "blind."[118] "Double-blind administrators do not know who the actual suspect is. Blind administrators are aware of that information but shield themselves from knowing where the suspect is located in the lineup or photo array."[119]

### ii. Pre-identification instructions[120]

*Was the witness instructed before the identification procedure that the suspect may or may not be present in the lineup, showup, or array, and that the witness need not make an identification?* A witness's expectation that a lineup will include the suspect may affect the identification's reliability. Studies attest to the phenomenon of "relative judgment," in which "the witness seems to be choosing the lineup member who

---

[118] *See, e.g.*, Clark, *supra* note 117, at 74 (noting, however, that "the lineup administration can influence the outcome even when blind administrator is used"); Haw & Fisher, *supra* note 117, at 1110-11; Gary L. Wells et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 LAW & HUM. BEHAV. 603, 627-29 (1998).

[119] *State v. Henderson*, 27 A.3d 872, 896 (N.J. 2011). Double-blind administration (where the administrator does not know which subject is the suspect) is not always a realistic option due to resource constraints and limited personnel. In *Henderson*, the New Jersey Supreme Court took note of the "envelope method," in which "an officer who knows the suspect's identity places single lineup photographs into different envelopes, shuffles them, and presents them to the witness." *Id.* at 897. During the witness's deliberations, "[t]he officer/administrator then refrains from looking at the envelopes or pictures while the witness makes an identification." *Id.*

[120] *See State v. Lawson*, 291 P.3d 673, 706 (Or. 2012) (en banc) ("Studies show that the likelihood of misidentification is significantly decreased" when witnesses are given such instructions and "[t]here appears to be little downside to giving [them]."); *see also Henderson*, 27 A.3d at 897.

most resembles the witness['s] memory *relative* to other lineup members."[121] Accordingly, studies show that misidentification is less likely if the witness is informed that the suspect might not be in the lineup. For example, two meta-analyses compared the effect of different instructions in lineups in which the perpetrator was present and lineups in which he was not.[122] Both studies concluded that failing to inform a witness that the perpetrator might not be present, when the perpetrator in fact was not, led to more incorrect identifications; that is, a witness tended to select the person who best resembled the one in the witness's memory.[123] By contrast, one of the studies found that

---

[121] Gary L. Wells, *The Psychology of Lineup Identifications*, 14 J. APPLIED SOC. PSYCHOL. 89, 92 (1984) (emphasis in original); *see also* Nancy K. Steblay, *Lineup Instructions*, *in* REFORM OF EYEWITNESS IDENTIFICATION PROCEDURES 65, 74 (Brian L. Cutler ed., 2013) (summarizing studies) ("One well-documented secondary strategy [of identification] is *relative judgment*, that is, the comparison of lineup members with one another to select the one who looks most like the offender relative to the other lineup members." (citing Wells, *The Psychology of Lineup Identifications*, *supra*)).

[122] A "meta-analysis" is "a synthesis of all obtainable data collected in a specified topical area." Roy S. Malpass et al., *The Need for Expert Psychological Testimony on Eyewitness Identification, in* EXPERT TESTIMONY ON THE PSYCHOLOGY OF EYEWITNESS IDENTIFICATION 3, 15 (Brian L. Cutler ed., 2009).

[123] *See* Steven E. Clark, *A Re-Examination of the Effects of Biased Lineup Instructions in Eyewitness Identification*, 29 LAW & HUM. BEHAV. 395, 396-97 (2005); Nancy Mehrkens Steblay, *Social Influence in Eyewitness Recall: A Meta-Analytic Review of Lineup Instruction Effects*, 21 LAW & HUM. BEHAV. 283, 294 (1997) (summarizing studies and stating that "the available data support the hypothesis that biased instructions significantly affect eyewitness lineup identification performance"). The United States Department of Justice made a suggestion for similar instructions in its 1999 research report. U.S. DEP'T OF JUSTICE, NAT'L INST. OF JUSTICE, EYEWITNESS EVIDENCE: A GUIDE FOR LAW ENFORCEMENT 32 (1999) [hereinafter EYEWITNESS EVIDENCE]; *see also Tegoseak v. State*, 221 P.3d 345, 358 (Alaska App. 2009) ("[Witnesses] tend to select the person who looks most like their memory of the culprit, even when none of the photos matches their memory exactly.").

instructing witnesses that the lineup might not contain the perpetrator had "minimal effect" on identifications when the perpetrator *was* present;[124] the other found that such instructions increased correct identifications of the perpetrator.[125]  Both studies emphasized the context of the latter finding:  in the real world, the police may not know whether a suspect is in fact the perpetrator, and the identification will be affected by a host of other variables.[126]  Accordingly, "no good can come from biased instructions."[127]

### iii.    The composition of lineups and photographic arrays[128]

*Were there at least five subjects in the lineup or array besides the suspect? Did the suspect stand out in any way from the "fillers"?*  Lineups and photo arrays can be constructed in ways that affect their reliability.  Most obviously, reliability is compromised if the suspect noticeably stands out from the "fillers" who make up the rest of the group.[129]  As a compounding factor, a lineup that suggests a result to the witness

---

[124]    Steblay, *supra* note 123, at 288-89.

[125]    Clark, *supra* note 123, at 418.

[126]    Clark, *supra* note 123, at 420; Steblay, *supra* note 123, at 295-96.

[127]    Clark, *supra* note 123, at 420.

[128]    *See State v. Lawson*, 291 P.3d 673, 686 (Or. 2012) (en banc) ("The known-innocent subjects used as lineup fillers should be selected first on the basis of their physical similarity with the witness's description of the perpetrator; if no description of a particular feature is available, then the lineup fillers should be chosen based on their similarity to the suspect."); *see also State v. Henderson*, 27 A.3d 872, 897-99 (N.J. 2011).

[129]    Roy S. Malpass et al., *Lineup Construction and Lineup Fairness*, *in* 2 HANDBOOK OF EYEWITNESS PSYCHOLOGY: MEMORY FOR PEOPLE 155, 156 (Rod C.L. Lindsay et al. eds., 2007) ("Decades of empirical research suggest that mistaken

(continued...)

may artificially inflate the witness's confidence in the identification because of its apparent ease.[130]

Courts also conclude, based on the research, that lineups or arrays should include a minimum number of "fillers" in order to ensure an adequate test of the witness's recall and to reduce the chance that an identification is the result of guesswork.[131] Although there is no "magic number" of fillers,[132] many sources recommend a minimum of five per single suspect.[133] By the same logic and to reduce the possibility that a witness will err by guessing, each lineup or photo array should include only one suspect.[134]

---

(...continued)
eyewitness identifications are more likely to occur when the suspect stands out in a lineup.").

[130]    *See* David F. Ross et al., *When Accurate and Inaccurate Eyewitnesses Look the Same: A Limitation of the 'Pop-Out' Effect and the 10- to 12-Second Rule*, 21 APPLIED COGNITIVE PSYCHOL. 677, 687 (2007); Gary L. Wells & Amy L. Bradfield, *Measuring the Goodness of Lineups: Parameter Estimation, Question Effects, and Limits to the Mock Witness Paradigm*, 13 APPLIED COGNITIVE PSYCHOL. S27, S30 (1999) ("In short, the task of making an identification from a biased lineup probably appears to be an easy one, thereby leading the eyewitnesses to be more confident in their decision even while being more likely to make an error.").

[131]    *See Henderson*, 27 A.3d at 898.

[132]    *See id.* (quoting testimony from Dr. Gary L. Wells).

[133]    *See* Roy S. Malpass et al., *supra* note 129, at 157-58; *see also* EYEWITNESS EVIDENCE, *supra* note 123, at 29. In Young's case, an investigating detective testified that photo arrays, in his experience, generally include "five other people that look basically like [the suspect]."

[134]    EYEWITNESS EVIDENCE, *supra* note 123, at 29.

There is significant debate about the desirability of sequential identification procedures — where suspects are viewed one at a time — as opposed to simultaneous identification procedures, like lineups and photo arrays, where suspects are viewed as a group. [135] Some scholars believe that the sequential procedure reduces the impact of "relative judgment," thereby increasing accuracy.[136] Others find this conclusion premature.[137] Current research on simultaneous versus sequential procedures seems insufficient to preclude either.

---

[135] The State points to this difference in its arguments that the science of eyewitness identifications is inconclusive.

[136] *See, e.g.*, Nancy Steblay et al., *Eyewitness Accuracy Rates in Sequential and Simultaneous Lineup Presentations: A Meta-Analytic Comparison*, 25 LAW & HUM. BEHAV. 457, 459-60, 462-64, 468 (2001).

[137] *See, e.g.*, Roy S. Malpass et al., *Public Policy and Sequential Lineups*, 14 LEGAL & CRIMINOLOGICAL PSYCHOL. 1, 11 (2009) ("Attempts to find alternative technologies are laudable, and the work on the sequential lineup is pioneering. However, research has not shown it to be better than what it intends to replace."); Laura Mickes et al., *Receiver Operating Characteristic Analysis of Eyewitness Memory: Comparing the Diagnostic Accuracy of Simultaneous Versus Sequential Lineups*, 18 J. EXPERIMENTAL PSYCHOL.: APPLIED 361, 374-75 (2012) (observing that some initial evidence "suggests that switching from the simultaneous lineup procedure to the sequential lineup procedure may be moving in the wrong direction [and] [o]nly time will tell whether this ends up being the typical empirical result"); .

#### iv.    Feedback and recording confidence[138]

*What feedback, if any, did the witness receive about the identification procedure from the administrator?  What expressions of confidence, if any, did the witness make at the time of the identification?*  An administrator's unconscious cues risk influencing an eyewitness identification after as well as before the witness has selected a suspect.  Witnesses who receive confirmatory feedback express "significantly more . . . confidence in their decision compared with participants who received no feedback,"[139] and such feedback can lead witnesses to "significantly inflate their reports to suggest better witnessing conditions at the time of the crime, stronger memory at the time of the lineup, and sharper memory abilities in general."[140]  Studies suggest that confirmatory

---

[138]    *See State v. Henderson*, 27 A.3d 872, 899-900 (N.J. 2011) (observing that because of the malleability of an eyewitness's confidence level and the effect that feedback can have on reliability, it is good practice for the administrator of an identification procedure to make an immediate record of any expression of confidence by the witness before giving the witness any feedback); *State v. Lawson*, 291 P.3d 673, 687 (Or. 2012) (en banc).

[139]    Amy Bradfield Douglass & Nancy Steblay, *Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect*, 20 APPLIED COGNITIVE PSYCHOL. 859, 863 (2006).

[140]    *Id.* at 864-65; *see also*  Gary L. Wells & Amy L. Bradfield, *"Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience*, 83 J. APPLIED PSYCHOL. 360, 374 (1998) ("A confirming-feedback remark not only inflates eyewitnesses' recollections of how confident they were at the time, it also leads them to report that they had a better view of the culprit, that they could make out details of the face, that they were able to easily and quickly pick him out of a lineup, that his face just 'popped out' to them, that their memorial image of the gunman is particularly clear, and that they are adept at recognizing faces of strangers."); IDENTIFYING THE CULPRIT, *supra* note 81, at 91 ("The nature of law enforcement interactions with the eyewitness before, during, and after the identification plays a role in the accuracy of eyewitness identifications and in the confidence expressed in the
(continued...)

feedback has an effect even when it comes 48 hours after an identification,[141] and the effect is powerful across other variables.[142]

### v. Showups[143]

*Was the witness identified in a showup?* A "showup" is an identification procedure in which a witness is presented with a single suspect and asked if the suspect is the person who committed the crime.[144] Alaska courts have long restricted the use of showups as an identification procedure to where it is necessary under the circumstances.[145] The problems with showups are apparent: in contrast to lineups and

---

(...continued)
accuracy of those identifications by witnesses."); *see also Tegoseak v. State,* 221 P.3d 345, 356-57 (Alaska App. 2009) (discussing how "the comments of a police investigator can alter a witness's perception or memory," specifically how long they viewed the perpetrator, how good their view was, how closely they paid attention, and even "their recollection of their degree of certainty" at the time of the crime (emphasis omitted)).

[141]    Gary L. Wells et al., *Distorted Retrospective Eyewitness Reports as Functions of Feedback and Delay*, 9 J. EXPERIMENTAL PSYCHOL.: APPLIED 42, 49-50 (2003).

[142]    *See* Jeffrey S. Neuschatz et al., *The Effects of Post-Identification Feedback and Age on Retrospective Eyewitness Memory*, 19 APPLIED COGNITIVE PSYCHOL. 435, 449 (2005) (describing study in which "the post-identification feedback effect did not vary with age or retention interval, which indicates how powerful the effect truly is").

[143]    *See Lawson*, 291 P.3d at 707-08 ("Showups are widely regarded as inherently suggestive — and therefore less reliable than properly administered lineup identifications — because the witness is always aware of who police officers have targeted as a suspect," though "some research indicates that, when conducted properly and within a limited time period immediately following an incident, showups can be equally as reliable as lineups."); *see also Henderson*, 27 A.3d at 902-03.

[144]    *See Anderson v. State*, 123 P.3d 1110, 1112 (Alaska App. 2005).

[145]    *See, e.g.*, *Howe v. State*, 611 P.2d 16, 17-18 (Alaska 1980); *see also* (continued...)

photo arrays, which allow a witness with a faulty memory to pick someone other than the suspect, every positive identification in a showup implicates the suspect.[146] Showups seemingly provide little protection against witnesses who are inclined to guess, as witnesses participating in showups tend to base their identifications on clothing.[147] Research shows that an innocent suspect who resembles the actual perpetrator is more likely to be incorrectly identified in a showup than in a lineup.[148]

Showups can be reliable when they are conducted immediately after a crime, when the witness's memory is freshest; but research shows that the likelihood of a misidentification increases significantly with showups as little as two hours after the event.[149]

---

(...continued)
*Anderson*, 123 P.3d at 1116-17 ("As courts have frequently noted, show-ups are inherently suggestive. . . . [But] in cases where a show-up is necessary, these factors [indicating suggestiveness] do not, by themselves, make that show-up a violation of the suspect's rights under the due process clause.").

[146]    *See Lawson*, 291 P.3d at 707-08 ("[B]ecause showups involve a lone suspect, every witness who guesses will positively identify the suspect, and every positive identification is regarded as a 'hit.' For that reason, misidentifications that occur in showups are less likely to be discovered as mistakes.").

[147]    *See* Jennifer E. Dysart et al., *Show-ups: The Critical Issue of Clothing Bias*, 20 APPLIED COGNITIVE PSYCHOL. 1009, 1019-21 (2006); *see also* Nancy Steblay et al., *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison*, 27 LAW & HUM. BEHAV. 523, 538 (2003).

[148]    Steblay et al., *supra* note 147 at 536-37.

[149]    *See* A. Daniel Yarmey et al., *Accuracy of Eyewitness Identifications in Showups and Lineups*, 20 LAW & HUM. BEHAV. 459, 464-65 (1996) ("[A]fter [two hours] a one-person lineup was four times as likely to lead to a false identification of the innocent suspect than if that same suspect was in a six-person lineup . . . .").

### vi. Multiple viewings[150]

*Was the witness exposed to the suspect after the crime but before making the identification?*[151] *Did the witness fail to identify the suspect in an earlier procedure?* The reliability of an identification may suffer if the witness has viewed the suspect more than once during the investigation. This concern arises in part because witnesses struggle to determine whether their memory comes from their original observation of the perpetrator or a later one. Studies describe this as "source confusion" or "source monitoring" error.[152] It arises in a number of different contexts.

For example, "mugshot exposure" occurs when a witness is repeatedly exposed to a suspect's photograph. The witness may fail to identify the suspect on the first presentation but on the second will recognize the photo; including the same photo in a second presentation can thus raise the risk of misidentification.[153] A similar effect, "mugshot commitment," occurs when a witness identifies a suspect from a photograph and the same photograph is included in a later identification procedure; studies show that

---

[150] *See State v. Henderson*, 27 A.3d 872, 900-01 (N.J. 2011) (holding that due to the negative effects that can result from multiple viewings, "law enforcement officials should attempt to shield witnesses from viewing suspects or fillers more than once"); *Lawson*, 291 P.3d at 686-87.

[151] It is only exposure through state action that would constitute a "system variable" for purposes of the trial court's analysis of admissibility. Other exposures would be "estimator variables."

[152] *E.g.*, Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 LAW & HUM. BEHAV. 287, 289 (2006).

[153] *Id.* at 299.

in this circumstance the witness is more likely to remain "committed" to the suspect originally selected even if the identification was incorrect.[154]

### *Estimator Variables*

### i.    **Stress**[155]

*Did the witness view the perpetrator under particularly stressful conditions?* Stress is one of the so-called "estimator variables" — variables that are intrinsic to the event or the witness and not subject to later manipulation. The level of stress a witness experiences at the time of the crime may affect the accuracy of a later identification.[156] While the science shows that moderate levels of stress can help improve accuracy of perception, it also shows that high levels of stress can negatively affect the accuracy of both the witness's identification of the suspect and the witness's memory of other details of the crime.[157]   Acknowledging the "negative effect of stress on the

---

[154]    *See id.* at 290-91; Gunter Koehnken et al., *Forensic Applications of Line-Up Research*, *in* PSYCHOLOGICAL ISSUES IN EYEWITNESS IDENTIFICATION 205, 219 (Siegfried Ludwig Sporer et al. eds., 1996).

[155]    *See Henderson*, 27 A.3d at 904 ("[H]igh levels of stress are likely to affect the reliability of eyewitness identifications.  There is no precise measure for what constitutes 'high' stress, which must be assessed based on the facts presented in individual cases."); *Lawson*, 291 P.3d at 687.

[156]    *See, e.g.*, IDENTIFYING THE CULPRIT, *supra* note 81, at 94 ("High levels of stress or fear can affect eyewitness identification. . . .  Under conditions of high stress, a witness' ability to identify key characteristics of an individual's face (e.g., hair length, hair color, eye color, shape of face, presence of facial hair) may be significantly impaired.").

[157]    Kenneth A. Deffenbacher et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 LAW & HUM. BEHAV. 687, 699, 703 (2004) (finding "considerable support for the hypothesis that high levels of stress negatively impact both accuracy of eyewitness identification as well as accuracy of recall of crime-

(continued...)

reliability of eyewitness identifications" may help jurors counteract the "common misconception that faces seen in highly stressful situations can be 'burned into' a witness's memory."[158]

### ii.    Weapons focus[159]

*Was a weapon, or another unusual or distracting object, visible during the time the witness was viewing the perpetrator?*  When an extraordinary detail captures a witness's attention, the witness's ability to perceive other details may be compromised, undermining the reliability of an identification.[160]  The "weapons focus effect" is one "in which witnesses who observe a criminal with a visible weapon tend to remember less about the criminal's physical features and clothing than do witnesses who see the

---

(...continued)
related details"); Charles A. Morgan III et al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, 27 INT'L J.L. & PSYCHIATRY 265, 274-75 (2004) (finding that data "provide[d] robust evidence that eyewitness memory for persons encountered during events that are personally relevant, highly stressful, and realistic in nature may be subject to substantial error"); *see Tegoseak v. State*, 221 P.3d 345, 355 (Alaska App. 2009) ("[T]he witness will often grossly over-estimate the amount of time the perpetrator was in their view — especially if the witness was under stress or anxiety at the time [the witness] observed the events.").

[158]    *Lawson*, 291 P.3d at 701.

[159]    *See Henderson*, 27 A.3d at 904-05 ("When a visible weapon is used during a crime, it can distract a witness and draw his or her attention away from the culprit."); *see also Commonwealth v. Gomes*, 22 N.E.3d 897, 920 & n.7 (Mass. 2015).

[160]    *See* Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 LAW & HUM. BEHAV. 1, 10-12 (2009); *see also* IDENTIFYING THE CULPRIT, *supra* note 81, at 93 ("The presence of an unusual object at the scene of a crime can impair visual perception and memory of key features of the crime event.").

criminal either empty-handed or with a neutral object."[161] While the effect may be small, one study found it noteworthy.[162] The weapons focus effect may interact with other variables, such as a short duration of view (addressed below), to make an identification even less reliable.[163] And studies demonstrate that even objects that are nonthreatening but incongruous — such as a stalk of celery — can have the same distracting effect.[164]

### iii.   Duration of view[165]

*How long was the witness able to see the perpetrator?* While there is no minimum amount of time necessary for a witness's observation of a suspect to result in an accurate identification, longer viewings are more likely to lead to accurate identifications.[166] Relatedly, however, studies show that witnesses tend to overestimate

---

[161]     Kerri L. Pickel, *Remembering and Identifying Menacing Perpetrators: Exposure to Violence and the Weapon Focus Effect*, *in* 2 HANDBOOK OF EYEWITNESS PSYCHOLOGY: MEMORY FOR PEOPLE 339, 347-53 (Rod C.L. Lindsay et al. eds., 2007).

[162]     *See* Nancy Mehrkens Steblay, *A Meta-Analytic Review of the Weapon Focus Effect*, 16 LAW & HUM. BEHAV. 413, 415-17, 420-21 (1992) (noting average decrease in accuracy of about 10% in weapon-present conditions over weapon-absent conditions).

[163]     *See id.* at 421 ("[S]ituations in which a witness observes a threatening object play a central role in an event of short duration.").

[164]     *See* Pickel, *supra* note 161, at 353-54 (discussing studies).

[165]     *See State v. Lawson*, 291 P.3d 673, 687 (Or. 2012) (en banc) ("Longer durations of exposure (time spent looking at the perpetrator) generally result in more accurate identifications."); *see also State v. Henderson*, 27 A.3d 872, 905 (N.J. 2011).

[166]     *See* IDENTIFYING THE CULPRIT, *supra* note 81, at 97-98 (noting that meta-analyses "have found that relatively long exposure durations produce greater accuracy"); Colin Tredoux et al., *Eyewitness Identification*, *in* 1 ENCYCLOPEDIA OF APPLIED PSYCHOL. 875, 877 (Charles Spielberger ed., 2004) ("The duration of the witness's exposure to the offender is related to later recognition performance, such that limiting

(continued...)

the amount of time they had to view an incident, especially if conditions were stressful or involved other stimuli.[167]

####      iv.      Environmental conditions of view[168]

*What environmental conditions, such as distance and lighting, may have affected the witness's ability to view the perpetrator?* Environmental conditions under which a witness views a perpetrator have an effect on the reliability of the identification. For example, a witness's identification will be less reliable when the perpetrator is seen from farther away or under worse lighting conditions; studies have examined these effects.[169] People have difficulty estimating distances, which makes self-reports of proximity somewhat suspect.[170] Other factors, such as weather conditions, can affect a witness's ability to perceive. And as with other variables, environmental factors interact with others: for example, studies demonstrate that witnesses who received confirmatory

---

(...continued)
exposure time generally reduces witness accuracy.").

[167]      *See* Elizabeth F. Loftus et al., *Time Went by So Slowly: Overestimation of Event Duration by Males and Females*, 1 APPLIED COGNITIVE PSYCHOL. 3, 10-12 (1987); A. Daniel Yarmey, *Retrospective Duration Estimations for Variant and Invariant Events in Field Situations*, 14 APPLIED COGNITIVE PSYCHOL. 45, 52-53 (2000).

[168]      *See Lawson*, 291 P.3d at 687 ("The basic environmental conditions of distance and lighting, combined with any aspect of the viewing environment — fog, heavy rain or other weather conditions, cracked or dirty windows, glare, reflection, shadow, or even physical obstructions within the witness's line of sight — can potentially impair an eyewitness's ability to clearly view an event or a perpetrator."); *see also Henderson*, 27 A.3d at 906.

[169]      *See, e.g.*, R.C.L. Lindsay et al., *How Variations in Distance Affect Eyewitness Reports and Identification Accuracy*, 32 LAW & HUM. BEHAV. 526, 526-28, 532-35 (2008).

[170]      *Id.* at 533.

feedback may report that the viewing conditions were more favorable than they actually were, meaning that self-reporting may become both more confident and less reliable over time.[171]

### v. Witness characteristics[172]

*Were there any characteristics of the witness, such as mental and physical health, age, vision, or alcohol or drug use, that may have compromised the witness's ability to see and identify the perpetrator?* The witness's own personal characteristics affect the accuracy of an identification. Physical and mental condition and visual acuity are relevant, but there are other factors as well, such as alcohol impairment[173] and age — especially for the elderly and the very young.[174]

---

[171]    *See* Wells & Bradfield, *supra* note 140, at 372-75.

[172]    *See Lawson*, 291 P.3d at 687 ("Although different witnesses and fact patterns may implicate different variables, some common variables that affect the ability to perceive and remember include visual acuity, physical and mental condition (illness, injury, intoxication, or fatigue), and age."); *see also Henderson*, 27 A.3d at 906.

[173]    *See* Jennifer E. Dysart et al., *The Intoxicated Witness: Effects of Alcohol on Identification Accuracy from Showups*, 87 J. APPLIED PSYCHOL. 170, 174 (2002) (finding, perhaps not surprisingly, that intoxicated witnesses were "more likely than sober [witnesses] to make a false identification from a target-absent showup").

[174]    *See* James C. Bartlett & Amina Memon, *Eyewitness Memory in Young and Older Adults*, *in* 2 HANDBOOK OF EYEWITNESS PSYCHOLOGY: MEMORY FOR PEOPLE 309, 332-34 (Rod C.L. Lindsay et al. eds., 2007) (explaining that though older eyewitnesses generally have less accurate identifications, the effect may be absent, or even reversed, for highly educated and verbally skilled seniors or those under the age of 70); Joanna D. Pozzulo & R.C.L. Lindsay, *Identification Accuracy of Children Versus Adults: A Meta-Analysis*, 22 LAW & HUM. BEHAV. 549, 563-65 (1998). Research also suggests that the relative ages of the witness and the *target* of the identification may also matter, finding that young witnesses are better at identifying young targets than older targets. Bartlett & Memom, *supra*, at 321-26; Melissa Boyce et al., *Belief of Eyewitness*

(continued...)

### vi.    Perpetrator characteristics[175]

*Was the perpetrator disguised or otherwise difficult to describe?  Has the suspect's appearance changed since the crime?*  The characteristics of the perpetrator also affect the reliability of eyewitness identification.  Witnesses are better at identifying individuals with distinctive facial features than those without.[176]  As one would expect, studies show that disguises reduce the accuracy of identifications.[177]  Masks, sunglasses, hats, hoods, and other things that hide the hair and hairline affect witnesses' ability to accurately identify a perpetrator.[178]  And changes in the perpetrator's appearance between the time of the incident and the time of the identification (growing a beard, for example) may do the same.[179]

---

(...continued)

*Identification Evidence*, *in* 2 HANDBOOK OF EYEWITNESS PSYCHOLOGY: MEMORY FOR PEOPLE 501, 512 (Rod C.L. Lindsay et al. eds., 2007) ("People are better at identifying those who are closer to them in age[]. . . .  [Thus,] [p]erhaps people should only use age as a factor in deciding whether to believe an eyewitness if there is a large age difference between the witness and the suspect.").

[175]    *See Henderson*, 27 A.3d at 907; Lawson, 291 P.3d at 688.

[176]    *See* Peter N. Shapiro & Steven Penrod, *Meta-Analysis of Facial Identification Studies*, 100 PSYCHOL. BULL. 139, 145 (1986) ("[D]istinctive targets [are] easier to recognize than ordinary looking targets.").

[177]    Brian L. Cutler et al., *Improving the Reliability of Eyewitness Identification: Putting Context into Context*, 72 J. APPLIED PSYCHOLOGY 629, 635 (1987).

[178]    *See, e.g.*, Brian L. Cutler, *A Sample of Witness, Crime, and Perpetrator Characteristics Affecting Eyewitness Identification Accuracy*, 4 CARDOZO PUB. L. POL'Y & ETHICS J. 327, 332 (2006).

[179]    K.E. Patterson & A.D. Baddeley, *When Face Recognition Fails*, 3 J. EXPERIMENTAL PSYCHOL.: HUM. LEARNING & MEMORY 406, 410, 414 (1977).

### vii. Race and ethnicity bias[180]

*Are the witness and the perpetrator of different races or ethnicities?* Research also convincingly demonstrates that witnesses are much more likely to accurately identify members of their own race or ethnicity than members of others, and that eyewitness identification is therefore likely to be less reliable if witness and perpetrator are of different races.[181]

### viii. Memory decay/retention interval[182]

*How much time passed between the crime and the identification procedure?* Research has not identified a precise time after which a witness's identification is unreliable, but the more time that passes between the initial confrontation and the identification, the more reliability suffers.[183] And studies show that memory decay is

---

[180] *See Henderson*, 27 A.3d at 907; Lawson, 291 P.3d at 688.

[181] IDENTIFYING THE CULPRIT, *supra* note 81, at 96 ("The race and ethnicity of a witness as it relates to that of the perpetrator is another important estimator variable."); *see generally* Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 PSYCHOL., PUB. POL'Y, & L. 3, 4-13, 27 (2001) (concluding that, because own-race bias presents a significant risk of false identifications, the issue is of "great practical importance").

[182] *See Lawson*, 291 P.3d at 705 ("Estimating the effect of memory decay . . . turns in large part on the strength and quality of the initial memory encoded . . . . Consequently, memory decay must be viewed in conjunction with other variables, such as cross-racial identification, weapon-focus, degree of attention, distance, lighting, and duration of initial exposure."); *see also Henderson*, 27 A.3d at 907.

[183] Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. EXPERIMENTAL PSYCHOL: APPLIED 139, 142 (2008) ("[M]emory strength will be weaker at longer retention intervals than at briefer ones.").

exponential rather than linear; that is, an eyewitness's memory vanishes more rapidly as time goes by.[184]

### ix.     Co-witnesses[185]

*Did the witness discuss the identification or receive information about the suspect from co-witnesses or other non-state actors?*  The actions of third parties, like those of law enforcement personnel, can affect the reliability of eyewitness identifications.[186]  Studies show that feedback from other witnesses can influence a witness's memory of an event and that such feedback can cause witnesses to form false

---

[184]     *See, e.g.*, IDENTIFYING THE CULPRIT, *supra* note 81, at 98 ("[T]he amount of time that passes from the initial observation and encoding of a memory to a future time when the initial observation must be recalled from memory[] can affect identification accuracy."); Deffenbacher, *supra* note 183, at 147-48 (describing findings of a "meta-analysis of 53 facial memory studies").

[185]     *See Henderson*, 27 A.3d at 907-09 (citing studies showing that "[c]o-witness feedback may cause a person to form a false memory of details that he or she never actually observed.").

[186]     *See* Elin M. Skagerberg, *Co-Witness Feedback in Line-Ups*, 21 APPLIED COGNITIVE PSYCHOL. 489, 494-95 (2007); *see also* IDENTIFYING THE CULPRIT, *supra* note 81, at 93.

memories of details.[187]  Further, feedback from other witnesses delivered indirectly —

through a third party — can influence the reliability of an identification.[188]

* * *

This evolved understanding of the factors affecting eyewitness

identifications shows convincingly that the *Brathwaite* test does not adequately assess

reliability.  First, though purporting to test reliability, the *Brathwaite* test does not

consider many of the factors now known to affect it; the test relies primarily on the five

*Biggers* factors, which include "the opportunity of the witness to view the criminal at the

time of the crime, the witness' degree of attention, the accuracy of his prior description

of the criminal, the level of certainty demonstrated at the confrontation, and the time

between the crime and the confrontation."[189]  While the State argues that this list is not

exclusive and while some other courts have noted other factors,[190] we are directed to no

---

[187]     Helen M. Paterson & Richard I. Kemp, *Comparing Methods of Encountering Post-Event Information: The Power of Co-Witness Suggestion*, 20 APPLIED COGNITIVE PSYCHOL. 1083, 1095-98 (2006); John S. Shaw, III et al., *Co-Witness Information Can Have Immediate Effects on Eyewitness Memory Reports*, 21 LAW & HUM. BEHAV. 503, 516-18 (1997); Rachel Zajac & Nicola Henderson, *Don't It Make My Brown Eyes Blue: Co-Witness Misinformation About a Target's Appearance Can Impair Target-Absent Line-up Performance*, 17 MEMORY 266, 275-77 (2009).

[188]     *See* Paterson & Kemp, *supra* note 187, at 1097-98; Shaw, *supra* note 187, at 518-21.

[189]     *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (discussing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

[190]     *See* Suzannah B. Gambell, *The Need to Revisit the* Neil v. Biggers *Factors: Suppressing Unreliable Eyewitness Identifications*, 6 WYO. L. REV. 189, 207-14 (2006) (summarizing jurisdictions examining factors in addition to the five *Biggers* factors under *Brathwaite*).

appellate decision in Alaska that has relied on any factors other than the listed five.[191] Adhering to the *Brathwaite* test means that trial courts are unlikely to consider many system and estimator variables now known to affect the reliability of eyewitness identifications.

Second, three of the five *Biggers* factors used in the *Brathwaite* test — the witness's degree of attention, opportunity to view, and level of certainty — rely on the witness's own subjective perceptions.[192] But many factors affect the accuracy of self-reporting, as discussed above, and witnesses may be unaware of them. The *Brathwaite* test is weakened by its heavy dependence on self-reporting with no means of gauging that reporting's reliability.[193]

With respect to an eyewitness's level of certainty, the relationship between certainty and accuracy is not straightforward and is significantly affected by other characteristics of both the identification and the witness.[194] As discussed above, an

---

[191]    *See, e.g.*, *Walker v. State*, 652 P.2d 88, 95 (Alaska 1982); *Vessell v. State*, 624 P.2d 275, 279 (Alaska 1981); *Howe v. State*, 611 P.2d 16, 18 (Alaska 1980); *Holden v. State*, 602 P.2d 452, 456 (Alaska 1979); *Young v. State*, 331 P.3d 1276, 1280-81 (Alaska App. 2014); *White v. State*, 773 P.2d 211, 215 (Alaska App. 1989); *Dunbar v. State*, 677 P.2d 1275, 1278 (Alaska App. 1984); *State v. Contreras*, 674 P.2d 792, 820 (Alaska App. 1983), *rev'd on other grounds sub nom. Contreras v. State*, 718 P.2d 129 (Alaska 1986).

[192]    Wells & Quinlivan, *supra* note 160, at 9 (explaining that "[p]sychological scientists are highly skeptical of [subjective] retrospective self-reports because of well-known tendencies for such reports being at odds with objective facts").

[193]    *See id.* ("At another level, psychological scientists find it somewhat odd that an eyewitness, whose credibility as a witness is being assessed, would be asked to report on his or her own credibility.").

[194]    *See* Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 ANN. REV. PSYCHOL. 277, 283-84 (2003).

eyewitness's certainty can be increased by feedback from law enforcement personnel or other witnesses;[195] and studies show that "[t]his certainty-inflation effect is greater for eyewitnesses who make mistaken identifications than it is for those who make accurate identifications, resulting in a significant loss in the certainty-accuracy relation."[196] This is additionally problematic because eyewitnesses' certainty in their identifications may be of great weight to jurors,[197] who, like the witnesses themselves, are not likely to be aware of the factors that can affect the relationship between confidence and accuracy.[198]

---

[195] *See supra* Section IV.A.3.b.viii.

[196] Wells & Olson*, supra* note 194, at 283; *see also* Amy L. Bradfield et al., *The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy*, 87 J. APPLIED PSYCHOL. 112, 117 (2002) ("Our results indicate that confirming feedback significantly diminishes the strength of the certainty-accuracy relation, thereby reducing the usefulness of retrospective certainty reports as cues to identification accuracy. The strength of the certainty-accuracy relation was diminished because confirming feedback inflated the retrospective certainty reports of inaccurate witnesses but not the reports of accurate witnesses.").

[197] *See* Michael R. Leippe et al., *Cueing Confidence in Eyewitness Identifications: Influence of Biased Lineup Instructions and Pre-Identification Memory Feedback Under Varying Lineup Conditions*, 33 LAW & HUM. BEHAV. 194, 194 (2009) (summarizing studies and concluding that, "[a]mong other insights, several conclusions may be drawn from the research," including that "factfinders tend to overestimate the accuracy of eyewitnesses who express confidence in their identifications").

[198] *See* Tanja Rapus Benton et al., *Eyewitness Memory Is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts*, 20 APPLIED COGNITIVE PSYCHOL. 115, 119-20 (2006) (concluding that "large discrepancies between juror and expert knowledge were found for . . . the accuracy-confidence relation," among other factors, and that only 50% of jurors were aware of the malleability of confidence as a factor affecting eyewitness identifications).

The science also shows that a highly suggestive procedure can reinforce a mistaken identification in a witness's mind.[199] As described above, factors contributing to a finding of unnecessary suggestiveness could themselves make identifications unreliable by giving witnesses an artificially inflated belief in the accuracy of their erroneous identifications.[200] Because the *Brathwaite* test assesses reliability only after the defendant has shown that the procedure was unnecessarily suggestive, the test could have the perverse effect of making it *more likely* an improperly suggestive identification procedure will be found reliable and admissible, because the suggestiveness itself has made the witness more certain.[201]

        c.      **The new test, consistent with the due process clause of Alaska's constitution, for determining the admissibility of eyewitness identification evidence affected by suggestive state procedures**

Young argues that we should adopt a rule of per se exclusion for eyewitness identifications that are affected by system variables, that is, those that are subject to influence by the State. He argues that this approach will better deter improper police practices and protect defendants' constitutional rights. While per se exclusion would result in the greatest protection against the effects of unreliable eyewitness identifications, we agree with the State that a rule of per se exclusion, "requir[ing] suppression of reliable evidence any time a law enforcement officer missteps,"[202] goes too far. We have rejected such a rule in the past, "both because it runs counter to the

---

    [199]    *See* Wells & Quinlivan, *supra* note 160, at 9-14.

    [200]    *See id.* at 16-17.

    [201]    *See id.*; *Tegoseak v. State*, 221 P.3d 345, 356-57 (Alaska App. 2009) (noting the same analytical flaw).

    [202]    *See State v. Henderson*, 27 A.3d 872, 878 (N.J. 2011).

clear weight of authority in Alaska and the federal system, and because it results in the unnecessary exclusion of much reliable evidence."[203]

Instead, the test we announce today acknowledges the evolution in our understanding of factors that affect the reliability of eyewitness identifications, thereby protecting defendants' rights to due process under the Alaska Constitution, while at the same time taking into account law enforcement's need for eyewitness evidence. It closely follows the framework set out by the Supreme Court of New Jersey in *State v. Henderson*.[204]

First, to be entitled to an evidentiary hearing on the issue, the defendant must present "some evidence of suggestiveness that could lead to a mistaken identification."[205] This proffer must "be tied to a system — and not an estimator — variable,"[206] consistent with the principle of due process law that only state action triggers constitutional protections.[207] We emphasize that a defendant need not show that a procedure was "unnecessarily suggestive" in order to get a hearing; that the identification involved a system variable is itself enough to trigger that process.

---

[203]     *See Viveros v. State*, 606 P.2d 790, 792 n.1 (Alaska 1980).

[204]     27 A.3d at 919-22.

[205]     *Id.* at 920.

[206]     *Id.*

[207]     *See Nichols v. Eckert*, 504 P.2d 1359, 1362 (Alaska 1973) ("For [the due process] clause to apply there must be state action and the deprivation of an individual interest of sufficient importance to warrant constitutional protection.").

At the hearing the State must present evidence that the identification is nonetheless reliable.[208] The superior court's ensuing analysis of reliability should consider all relevant system and estimator variables under the totality of the circumstances.[209] Although the variables to consider include those discussed above, we emphasize that the list is non-exclusive; the scientific understanding of eyewitness memory continues to evolve.[210] Because of this, trial courts should not hesitate to take expert testimony that explains, supplements, or challenges the application of these variables to different fact situations.

Although the defendant must only identify a relevant system variable in order to obtain a hearing, the defendant retains the burden of proving at that hearing a "very substantial likelihood of irreparable misidentification."[211] If the defendant meets this burden, the trial court should suppress the evidence — both the pretrial identification and any subsequent in-court identification by the witness.[212] If the defendant does not meet the burden, however, the court should admit the evidence and provide the jury with an instruction appropriate to the context of the case, which we discuss in greater detail below.[213]

---

[208]   *See Henderson*, 27 A.3d at 920.

[209]   *Id.*

[210]   *Id.* at 922 ("We recognize that scientific research relating to the reliability of eyewitness evidence is dynamic; the field is very different today than it was in 1977, and it will likely be quite different thirty years from now.").

[211]   *Id.* at 920.

[212]   *Id.*

[213]   *See id.*

"Of course, nothing has altered the State's burden of proving at trial the identity of the accused as the person who committed the charged offense beyond a reasonable doubt."[214]

### 4. Jury instructions should take into account this new test for the reliability of eyewitness identifications.

If eyewitness identification is a significant issue in a case, the trial court should issue an appropriate jury instruction that sets out the relevant factors affecting reliability. The Supreme Court in *Perry v. New Hampshire*, though retaining the *Brathwaite* test, took "account of other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability," noting especially "[e]yewitness-specific jury instructions, which many federal and state courts have adopted, . . . [that] warn the jury to take care in appraising identification evidence."[215] We agree that jury instructions specific to eyewitness identifications are necessary for the jury's proper understanding of the issue.

While it is "the province of the jury to determine credibility of witnesses,"[216] "the reliability of eyewitness identifications frequently is not a matter within the knowledge of an average juror."[217] Many of the factors that affect reliability "are counterintuitive and, therefore, not coterminous with 'common sense.' "[218] "Thus,

---

[214]    *State v. Henderson*, 77 A.3d 536, 544-45 (N.J. Super. Ct. App. Div. 2013).

[215]    132 S. Ct. 716, 728-29 (2012) (internal citations omitted).

[216]    *Galauska v. State*, 532 P.2d 1017, 1018 (Alaska 1975).

[217]    *State v. Guilbert*, 49 A.3d 705, 731 (Conn. 2012).

[218]    *Young v. Conway*, 698 F.3d 69, 79 (2d Cir. 2012) (noting, as factors affecting reliability, "the perpetrator's wearing a disguise, the presence of a weapon, the stress of the situation, the cross-racial nature of the crime, the passage of time between
(continued...)

while science has firmly established the 'inherent unreliability of human perception and memory,' this reality is outside 'the jury's common knowledge,' and often contradicts jurors' 'commonsense' understandings."[219]

We refer the issue of eyewitness-specific jury instructions to the Criminal Pattern Jury Instructions Committee and ask that it draft a model instruction appropriate for use in future cases, consistent with the principles we announce today.

**B.    It Was Error Not To Give A Specific Jury Instruction On The Reliability Of Eyewitness Identifications, But The Error Was Harmless.**

Young argues that the superior court erred when it refused to give a jury instruction specific to the reliability of eyewitness identifications.  Although trial courts are generally constrained to apply the law as it is rather than the law as they believe it should be, we agree that such an instruction should have been given in Young's case.

Alaska Rule of Criminal Procedure 30(b) states that "[t]he court shall instruct the jury on all matters of law which it considers necessary for the jury's information in giving their verdict"; "[w]hether or not a requested jury instruction should be given lies in the discretion of the trial court."[220]  " '[A]s long as the instructions actually given by the trial court adequately set forth the applicable law, a more elaborate

---

[218](...continued)
observation and identification, and the witness's exposure to defendant through multiple identification procedures").

[219]    *United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006) (quoting Rudolf Koch, Note, *Process v. Outcome: The Proper Role of Corroborative Evidence in Due Process Analysis of Eyewitness Identification Testimony*, 88 CORNELL L. REV. 1097, 1099 n.7 (2003)).

[220]    *Snyder v. State*, 930 P.2d 1274, 1280 (Alaska 1996).

explanation of the defendant's theory of the case' is not required unless it 'would substantially aid the jury in arriving at a just verdict.' "[221]

At trial, Young proposed two jury instructions specific to eyewitness evidence. The first discussed the burden of proof on identity and summarized factors other courts have found to affect the reliability of eyewitness identifications, including reference to the court of appeals' opinion in *Tegoseak v. State*.[222] The second proposed instruction was modeled after one approved by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Telfaire*.[223] The superior court declined to give either instruction. It found that *Tegoseak* was not controlling because its summary of the factors affecting the reliability of eyewitness identifications was dicta, that Young's draft instruction was "more argument than . . . a proposition of law," and that the proposed instruction would be redundant since the pattern instructions discuss the burden of proof and witness credibility generally. The superior court refused to give the *Telfaire* instruction for the same reasons. In affirming these rulings, the court of appeals relied on its prior decisions in which it had "affirmed convictions where the trial court gave the pattern instruction instead of a more focused instruction on eyewitness identification."[224]

---

[221] *Robart v. State*, 82 P.3d 787, 795 (Alaska App. 2004) (alteration omitted) (quoting *Lee v. State*, 760 P.2d 1039, 1041 (Alaska App. 1988)).

[222] 221 P.3d 345 (Alaska App. 2009).

[223] 469 F.2d 552, 558-59 (D.C. Cir. 1972).

[224] *Young v. State*, 331 P.3d 1276, 1281 (Alaska App. 2014) (citing *McGee v. State*, 614 P.2d 800, 804 (Alaska 1980); *Dayton v. State*, 598 P.2d 67, 68 (Alaska 1979); *Larson v. State*, 656 P.2d 571, 575-76 (Alaska App. 1982); *Williams v. State*, 652 P.2d 478, 480 (Alaska App.1982)).

The principle cited by the court of appeals originated in a 1977 opinion, *Buchanan v. State*.[225] In *Buchanan*, a defendant was charged with attempted sexual abuse of a minor, and the victim identified him in a pretrial lineup.[226] The superior court instructed the jury "that the state ha[d] the burden of proving accurate identification beyond a reasonable doubt," rejecting the defendant's requested instruction that went "beyond the court's instruction in that it focuse[d] attention on possible inadequacies of a witness' identification, such as the time intervening, the opportunity for the witness to observe in the first instance, and possible external influences on the witness' testimony."[227] We found no error in the court's decision because the instruction "given by the court embodied correct statements of the controlling law on the subject of identification."[228]

As described above, however, the understanding of the factors affecting the reliability of eyewitness identifications has evolved significantly since *Buchanan*[229] in ways that are "largely unfamiliar to the average person, and, in fact, many . . . are counterintuitive."[230] We can no longer say with confidence that the pattern witness

---

[225] 561 P.2d 1197 (Alaska 1977).

[226] *See id.* at 1200. At the time, the statute defined the crime as "lewd and lascivious acts toward a child." *Id.* at 200 (citing former AS 11.15.134).

[227] *Id.* at 1207.

[228] *Id.*

[229] *Buchanan* was decided in March 1977. 561 P.2d at 1197. The United States Supreme Court decided *Manson v. Brathwaite* three months later. *See* 432 U.S. 98 (1977).

[230] *State v. Guilbert*, 49 A.3d 705, 723 (Conn. 2012).

credibility instruction is adequate to explain the potential unreliability of eyewitness identifications.

Furthermore, eyewitness identification was a significant issue in Young's case:  he presented an alibi defense, and the State countered with eyewitnesses who claimed to have seen him behind the wheel of the shooters' vehicle.  Young challenged the admissibility of two of the identifications.  And the State's closing argument relied heavily on the eyewitnesses' testimony.

In these circumstances, an instruction alerting the jury to the potential fallibility of eyewitness identifications was "necessary for the jury's information in giving their verdict."[231]  And while it is true that the instructions Young proposed were "not perfect statements of Alaska law in this area," they "certainly sufficed to draw the matter . . . to the judge's attention."[232]

We cannot say, however, that the failure to give Young's requested jury instructions "appreciably affect[ed] the verdict" against him.[233]  First, the State's case did not rest on identification by a single witness; the State presented three independent witnesses with different perspectives and no apparent connections to each other, including one who had known Young before the crime.

---

[231]    Alaska R. Crim. P. 30(b).

[232]    *Des Jardins v. State*, 551 P.2d 181, 189 (Alaska 1976).

[233]    *Evans v. State*, 574 P.2d 24, 25-26 (Alaska 1978) (holding that failure to give informer instruction was harmless).  Young contends that "[i]n certain cases, focused instructions on how to evaluate eyewitness identification evidence are necessary to safeguard the presumption of innocence," citing *United States v. Telfaire*, 469 F.2d 552, 555 (D.C. Cir. 1972).  While we agree with Young's premise, this is not such a case. *Telfaire* dealt with "the uncorroborated testimony of a single witness." *Id.* at 554. In this case, given the other eyewitnesses and corroborating evidence, the error in failing to give an eyewitness identification instruction was not of constitutional dimension.

Second, in jury voir dire, cross-examination, and closing arguments, Young's attorneys raised and emphasized many of the concerns that would have been addressed by the proposed instructions.[234] In addition to criticizing the individual identifications specifically, Young's attorneys addressed a number of system and estimator variables, including the possibility that suggestion by law enforcement officers could result in a sincerely believed but false memory; the tendency of human memory to "fill in the holes" with things not actually witnessed; and the tendency of a witness to overstate the favorableness of the conditions under which the crime was viewed. Young's counsel discussed in voir dire a highly publicized case of wrongful conviction by eyewitness misidentification and referred to the case again in closing.[235]

Finally, the State's case against Young relied on other evidence besides the testimony of eyewitnesses, including his possession of both the gun and the key to the SUV allegedly involved in the shooting and the testimony of several witnesses that the assailants' SUV was Young's.

For these reasons, we conclude that the failure to give a jury instruction specific to eyewitness identification, though error, was harmless.

---

[234]     *Cf. Buchanan*, 561 P.2d at 1207 n.28 (noting "that all of the factors to which the instruction alluded were referred to by Buchanan's counsel in his final argument to the jury"); *Riley v. State*, 60 P.3d 204, 208 (Alaska App. 2002) (holding that flaws in jury instructions can be cured by the arguments of the parties).

[235]     The facts of that case are also discussed in *Tegoseak v. State*, 221 P.3d 345, 352-53 (Alaska App. 2009).

**C.** **The Superior Court Did Not Abuse Its Discretion By Denying Young's Motion For Mistrial.**

Young also claims that the court of appeals erred when it affirmed the superior court's denial of his motion for mistrial due to what the court of appeals found to be a discovery violation by the State: its failure to inform the defense that Arauz gave a statement to Detective Elzey on the night of the shooting, identifying Young as one of the shooters. We agree that the superior court did not abuse its discretion in denying a mistrial, though our analysis differs from that of the court of appeals.

Alaska Rule of Criminal Procedure 16(b)(1)(A)(i) requires the State to disclose to the defendant "[t]he names and addresses of persons known by the government to have knowledge of relevant facts and their written or recorded statements." In denying a mistrial, the superior court held that this rule did not apply to Arauz's statement to Detective Elzey because the statement had not been written or recorded; the superior court also found a lack of prejudice. The court of appeals disagreed with the superior court on whether the State's failure to disclose violated Rule 16(b)(1)(A)(i), holding that it did.[236] But the court of appeals nevertheless affirmed Young's conviction, holding that the superior court did not err in concluding that Young had failed to show a "plausible way in which his defense was prejudiced" by the State's failure to disclose.[237]

We agree with the court of appeals that there was a discovery violation. The police reports that *were* disclosed to the defense stated that Arauz had not been able to identify Young on the day of the shooting, which was the exact opposite of the

---

[236]    *Young v. State*, 331 P.3d 1276, 1283 (Alaska App. 2014).

[237]    *Id.*

reality.[238] As the court of appeals observed, to allow the State to avoid disclosing witness statements under circumstances like these — by the simple expedient of promising the witness that the statement will not be recorded — would "violate[] both the text and spirit of Criminal Rule 16, which is designed to prevent precisely this type of unfair surprise."[239]

We addressed the remedy for such discovery violations in *Bostic v. State*, in which we held that "a defendant is presumptively prejudiced when confronted with a Criminal Rule 16(b)(1)(A)(i) violation," and that "[t]he burden rests on the State to show that the defendant has not been prejudiced in the manner he specifically claims."[240]

Young claimed he was prejudiced because he was pursuing an alibi defense that relied on discrediting Arauz, the only eyewitness who knew Young by sight. He committed to his alibi defense in opening statements, when his attorney told the jury, "You will also hear evidence as to where Mr. Young was that day"; "[t]he individuals [who] were there that day did not see Mr. Young"; and "by the end of the presentation of the evidence, you will hear the inconsistencies and the substantial nature of the inconsistencies . . . by these witnesses." Later, when seeking a mistrial, Young's attorneys told the court that one of their considerations in advising Young to pursue an alibi defense was their perception of Arauz as "an individual [who is] adamant when he's interviewed [immediately after the shooting] that he couldn't see a thing, nothing, and then thereafter, about a month later, being called in, and . . . he was shown that lineup right before he went in to testify [at the grand jury]." Relying on that timeline and the prospect of impeaching Arauz, Young's attorneys steered the cross-examination of

---

[238]   *Id.*

[239]   *Id.*

[240]   805 P.2d 344, 349 (Alaska 1991).

Arauz toward demonstrating that he first realized Young was a suspect when he arrived at the grand jury, weeks after the shooting.[241] They pursued this line of questioning until brought up short by new information: that Arauz had, in fact, identified Young the day of the crime. The defense attorneys argued that had they known of Arauz's same-day identification they "may have changed [their] entire theory of the case to run justification" as a defense rather than alibi; in support of such a defense they cited evidence that someone in the second vehicle behind the targeted Buick may have fired at the pursuing silver SUV, as well as "multiple other ballistics evidence that hasn't been matched to anyone."

This was a specific claim of prejudice that the State was required to rebut.[242] We note that the court of appeals framed the defendant's initial burden of claiming prejudice in terms of plausibility: "Although the State bears the burden of disproving that the defendant was prejudiced by a mid-trial discovery violation, the defendant must *first* set forth some plausible way in which his defense was prejudiced."[243] While we agree that a claim of prejudice must be plausible before the State is required to rebut it, we emphasize that the defendant does not bear any *evidentiary* burden in raising the presumption.[244] The defendant's claim of prejudice need only be facially plausible in the

---

[241] Young's attorney asked Arauz, "Then you go to the grand jury, right? And you're shown a photo lineup, weren't you? . . . And so now you know that the State is suspecting [Young] . . . ."

[242] *See Bostic*, 805 P.2d at 349.

[243] *Young*, 331 P.3d at 1283 (emphasis added).

[244] The court of appeals observed that "Young did not make an offer of proof or ask to present information to the court *in camera* to establish that he had evidence to support the [justification] defense." *Id.* We agree that the stronger and better-supported the specific claim of prejudice, the more difficult it will be for the State to rebut it. But

(continued...)

context of the case; as we held in *Bostic*, to "burden . . . the non-offending party . . . with [having to show] proof that the violation resulted in the prejudice he specifically claims, rather than requiring the offending party to show that the violation did not result in such prejudice, is manifestly unjust."[245]

In response to Young's motion for mistrial, the State focused on what it termed the "minimal" effect of the new evidence on Young's alibi defense; it contended that the defense's "ability to cross-examine and point out that [Arauz] had changed his story, that he had originally lied to the police, was still there." The State argued that the defense's claim that it "would have . . . used a different theory of the case [was] a stretch" given that Young knew long before trial that Arauz had identified him at the grand jury and still opted against a justification defense.

Both the superior court and the court of appeals, in explaining why they found no prejudice, noted the fundamental inconsistency between a justification defense and the alibi defense Young actually put on.[246] But the fundamental inconsistency between the two theories is the major part of the prejudice Young claimed; if the defenses were not inconsistent, he would not have been significantly prejudiced by having to switch from one to the other mid-trial. And the brief continuance, while helping to address some of Young's claims of prejudice,[247] could not cure the prejudice

---

[244](...continued)
whether the presumption of prejudice arises does not depend on an offer of proof or an *in camera* evidentiary presentation by a defendant, like Young, who has made a specific claim of prejudice.

[245]     *Bostic*, 805 P.2d at 347.

[246]     *Young*, 331 P.3d at 1283.

[247]     For example, Young claimed that he needed more information about
(continued...)

of having committed irrevocably to one defense without knowing all its weaknesses. As we explained in *Bostic*, "A continuance would have given [the defendant] only more time to agonize over how to unring a bell that should never have been rung in the first place."[248]

We conclude, however, that the State successfully rebutted Young's specific claim of prejudice. As the prosecutor pointed out, the primary revision to the story of Arauz's identification was with regard to its timing. Young knew Arauz had failed to identify him on the day of the crime; what he did not know was that Arauz reversed course later the same day rather than three weeks later at the grand jury. The defense could still impeach Arauz by pointing out "that he had changed his story, that he had originally lied to the police." The untimely disclosure did not prevent Young's attorneys from arguing to the jury that Arauz had fabricated his identification.

We understand Young's argument that there is a significant difference between a spontaneous same-day identification and one made only after the police have identified the suspect. But the question is whether knowing the different timeline before trial would have prompted Young to abandon his alibi defense in favor of an unlikely alternative. The State's evidence, as described by the court of appeals, "showed that Young had been driving a silver SUV and firing shots at a car that was trying to get

_____

[247](...continued)
Arauz's same-day identification in order to effectively cross-examine him about it.

[248]    *Bostic*, 805 P.2d at 348. We noted in *Bostic* that, in contrast to a continuance, "[a] mistrial is a tailored remedy, which would allow both [the defendant] to restructure his defense in light of the sudden revelation of information which he was entitled to have all along, and the state to put on relevant evidence in its possession, should it deem the evidence too important to proceed without it." *Id.*

away."[249] On the basis of the information and arguments presented by both parties, the superior court reasonably concluded that Young was unlikely to have pursued a justification defense regardless of when he learned of Arauz's same-day identification. The loss of that option was Young's primary claim of prejudice and the one on which he focuses his appeal. Because the State rebutted the prejudice that Young specifically claimed, the superior court did not abuse its discretion when it denied Young's mistrial motion.

## V. CONCLUSION

We AFFIRM the court of appeals' decision affirming Young's conviction on the alternate grounds that admitting Gazewood's eyewitness identification and failing to give an eyewitness-specific jury instruction, though errors, were harmless.

---

[249]     *Young*, 331 P.3d at 1283.